UNITED STATES of America, Plaintiff,

v.

**POWER ENGINEERING COMPANY, Redoubt, Ltd., and Richard J. Lilienthal, Defendants/Third Party Plaintiffs,**

v.

**Jack LILIENTHAL, Third Party Defendant.**

**No. Civ.A. 97–B–1654.**

United States District Court, D. Colorado.

Aug. 17, 1998.

John N. Moscato, Environmental Enforcement Section, Environment & Natl. Resources Div., U.S. Department of Justice, Denver, CO, Linda A. Surbaugh, Assistant U.S. Attorney, Denver, CO, Thomas E. Sitz, Enforcement Attorney, U.S. Environmental Protection Agency, Region VIII, Denver, CO, for plaintiff.

John R. McBride, John J. Zodrow, Zodrow, et al., P.C., Denver, CO, for defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Plaintiff, United States of America ("the United States"), acting on behalf of the Environmental Protection Agency, moves for the issuance of an order requiring defendants, Power Engineering Company ("Power Engineering"), Redoubt, Ltd. ("Redoubt"), and Richard J. Lilienthal (collectively, "defendants"), to obtain financial assurances in the form of a surety bond that satisfies state regulations adopted by the Colorado Department of Public Health and Environment, found at 6 COLO.CODE REGS. 1007–3 § 266.14(f). The United States also moves to vacate the established briefing schedule regarding the jurisdictional issue raised at the August 6, 1998 hearing. The United States' motion is adequately briefed and oral argument will not materially aid its resolution. For the reasons set forth below, I grant the United States' motion.

## I. PROCEDURAL HISTORY

The United States commenced this action on August 1, 1997, alleging eight claims: (1) treatment of hazardous waste without a permit or interim status; (2) disposal of hazardous waste without a permit or interim status; (3) shipment of hazardous waste to an unpermitted facility; (4) improper container management; (5) storage of hazardous waste without a permit or interim status; (6) failure to provide employee training; (7) failure

to have a hazardous waste contingency plan; and (8) illegal operations (failure to have a groundwater monitoring program, failure to have a closure plan, failure to minimize releases of hazardous waste, and failure to obtain and provide financial assurances for closure and post-closure). The United States also alleges that Power Engineering has failed to comply with a CDPHE Administrative Compliance Order. Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 (1997).

The United States filed a motion for preliminary injunction on January 16, 1998, requesting issuance of an order requiring defendants to comply with Colorado hazardous waste regulations. These regulations require owners and operators of all hazardous waste facilities to document that they have secured the resources required to close their facilities in an appropriate and safe manner, and to pay third-party claims that may arise from facility operations. A preliminary injunction hearing was held beginning May 11, 1998. On June 10, 1998, I issued a Memorandum Opinion and Order ("the June 10 order") granting the United States' motion for preliminary injunction. The June 10 order directs defendants to provide financial assurances in the amount of $3,500,000 or show cause why they have not provided such financial assurances within thirty days.

Defendants filed a "Show Cause Submission" on July 10, 1998 that states defendants were in the process of finalizing trust arrangements and that the trust would be finalized within ten business days. Three draft trust agreements were attached to defendants' Show Cause Submission. These three draft trust agreements indicated that defendants intended the following properties to constitute the res of the trust: (1) Richard Lilienthal's undivided one-half interest in real property located in Eagle County, Colorado (current estimated value of $1,200,-000.00); (2) real property owned by Redoubt, Ltd. on which the Power Engineering facility operates (current estimated value $0.00; stated value in draft trust agreement of $2,000,000.00); and (3) 9,340 shares of UNUM stock owned by Power Engineering (current estimated value $520,000.00).

The United States filed a response to defendants' Show Cause Submission on July 24, 1998, objecting on four grounds. First, the United States argued that defendants' proposed trusts do not provide for joint and several liability because each trust has a separate grantor. The United States contended that one trust, rather than three separate trusts, should exist. Second, the United States argued that defendants impermissibly altered the trust agreement language required by Colorado regulations. Colorado regulations state: "Payments made to the Trustee shall consist of cash or securities acceptable to the Trustee." 6 COLO.CODE REGS. 1007–3 §§ 266.14(a) and 266.18(a)(1). The draft trust agreements impermissibly state:

> Contributions of Property made to the Trustee for the Fund may consist of the property set forth in the District Court's Order and other property acceptable to the Trustee.

(Ex. A to Def.'s Show Cause Submission at 2.) The United States contends that, because the June 10 order requires defendants to "provide financial assurance in the amount of $3,500,000 pursuant to 6 COLO.CODE REGS. 1007–3 § 266 and all applicable subparts," any trust must consist of cash or securities and not real property to ensure liquidity and prevent the diminishment of the trust res by subsequent impairment, such as tax liens. A letter from one of the bankers contacted by defendants also indicates that Norwest Bank would only establish a trust or escrow fund to hold assets "in liquid form." (Ltr. from Martinez of Norwest Bank of 7/20/98, Ex. A to Plf.'s Resp. to Def.'s Show Cause Submission.)

Third, the United States argued that two of the three properties proposed as trust res are inadequate. The United States contended that Richard Lilienthal's undivided one-half interest in real property located in Eagle County, Colorado (current estimated value of $1,200,000), is subject to a restrictive covenant regarding conveyance and has already been quitclaimed to Richard Lilienthal's wife. Defendants disputed this contention. The United States also contended that the property owned by Redoubt on which the Power Engineering facility operates is worthless until remediated. Thus, the only proposed res

acceptable to the United States is the stock owned by Power Engineering.

Fourth, the United States objected to other language of the draft trust agreements. Defendants modified the trust language, mandated by 6 COLO.CODE REGS. 1007-3 §§ 266.14(a) and 266.18(a)(1), regarding payment of remediation costs out of trust assets. The proposed trust agreements give defendants more power over trust assets than envisioned by Colorado regulations. In summary, the United States objects to defendants' failure to comply with the June 10 order, attempt to fund the proposed trusts with real property instead of cash or securities, attempt to provide real property that has an impaired value, and proposal to modify the trust agreement in a manner that allows defendants to authorize or prohibit payments from the trust assets. The United States did not move for contempt, but averred that the question of contempt "is one for the Court to determine." (Plf.'s Resp. to Def.'s Show Cause Submission at 9.)

Defendants filed a supplement to their show cause submission on July 27, 1998. Defendants contended that Norwest Bank did not disclose its objection to acting as Trustee of a trust funded by real property until July 20, 1998. Since receipt of the letter from Norwest Bank, Defendants allege that they have contacted eleven "companies" regarding the trust arrangement "previously ... discussed with Norwest Bank." (Def.'s Supp. at 2.)

A status conference was held on August 6, 1998 to address defendants' compliance with the June 10 order. At the commencement of the hearing, I raised the issue of whether defendants' Notice of Appeal, filed July 22, 1998, divested this court of jurisdiction to enforce the June 10 order. Neither the United States nor defendants were prepared to argue this issue. Thus, I established a briefing schedule that would have concluded on September 11, 1998.

Also during the status conference, the issues raised by defendants' Show Cause Submission and the United States' objections were addressed. I indicated that the United States' objections to the form of trusts proposed by defendants were valid. The June 10 order requires compliance with Colorado regulations and defendants' proposed trusts ignore many of important trust features mandated by these regulations, such as the type of res and powers of the grantor. I also noted that the United States' concerns regarding the property used to fund the trusts had merit. Clearly, Redoubt's land is not worth $2,000,000. The very purpose of financial assurances is to ensure that liquid assets exist to pay for remediation if defendants ignore their remediation responsibility. Although Redoubt's contaminated land may be valuable if remediated, the land surely does not constitute a valid financial assurance in its unremediated state.

Lastly, I noted at the August 6 status conference that the June 10 order is broadly worded. Nowhere does the June 10 order require defendants to provide financial assurances in the form of a trust funded by property discussed in that order. Rather, the June 10 order requires defendants to "provide financial assurance in the amount of $3,500,000 pursuant to 6 COLO.CODE REGS. 1007-3 § 266 and all applicable subparts." (Ord. of 6/10/98 at 46.) While I necessarily discussed defendants' personal and real property in the June 10 order, I did so only in assessing whether defendants had the ability to provide financial assurances. The order merely states:

> [Power Engineering's] readily available cash of $800,000, when combined with Lilienthal's *directly owned assets* of $1,400,-000, *could* be placed in a trust fund with a present value of $2,200,000. Defendants *could* borrow the remaining $1,300,000, obtaining an insurance policy for that fixed amount.

(Ord. of 6/10/98 at 25–26 (emphasis added)). I found that the evidence presented at the injunction hearing illustrated defendants' ability to provide financial assurances, but the June 10 order neither requires nor precludes defendants from funding a trust or other form of financial assurance with the property discussed in that order. Thus, defendants could have complied with the mandatory injunction by providing financial assurance comprised of insurance, bonds, trusts, or any combination thereof.

On August 7, 1998, one day after the status conference and outside the established briefing schedule, the United States filed a "Motion to Vacate the Briefing Schedule and Impose Financial Assurance Requirements." In its motion, the United States addresses the jurisdictional issue at length and concludes that this court has continuing jurisdiction to enforce the June 10 order notwithstanding defendant's notice of appeal. In light of defendants' insufficient trust proposal, the United States also moves for issuance of an order requiring defendants to obtain financial assurances in the form of a bond that complies with 6 COLO.CODE REGS. 1007–3 § 266.14(f) (Surety Bond Guaranteeing Payment into a Closure and/or Post Closure Trust Fund). As of today's date, defendants have not filed a response to the United States' August 7, 1998 motion.

## II. CONTINUING JURISDICTION

██ Generally, a party's filing of a notice of appeal divests the district court of jurisdiction. *Stewart v. Donges,* 915 F.2d 572, 574–576 (10th Cir.1990) (citations omitted). "[T]he filing of a notice of appeal, whether from a true final judgment or from a decision within the collateral order exception, 'is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.'" *Stewart,* 915 F.2d at 575 (quoting *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982)). The principle of jurisdictional transfer is not, however, absolute. No transfer occurs if the appeal is taken from a nonappealable order, *Riggs v. Scrivner, Inc.,* 927 F.2d 1146, 1148 (10th Cir.1991), or if the district court certifies that the appeal is frivolous, forfeited, or dilatory. *Stewart,* 915 F.2d at 577.

██ Further, appeals from interlocutory orders granting or denying injunctive relief present special considerations. Interlocutory, appellate review of a preliminary injunction order pursuant to 28 U.S.C. § 1292(a)(1) will not divest the district court of its jurisdiction to act on the merits of the case pending appeal. *State of Colorado v. Idarado Mining Co.,* 916 F.2d 1486, 1490 (10th Cir.1990) (citations omitted); Charles

A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 3921.2. Rule 62 provides, in relevant part:

Stay of Proceedings to Enforce a Judgment.

(a) Automatic Stay; Exceptions—Injunctions, Receiverships, and Patent Accountings. Except as stated herein, no execution shall issue upon a judgment nor shall proceedings be taken for its enforcement until the expiration of 10 days after its entry. *Unless otherwise ordered by the court, an interlocutory or final judgment in an action for an injunction or in a receivership action, or a judgment or order directing an accounting in an action for infringement of letters patent, shall not be stayed during the period after its entry and until an appeal is taken or during the pendency of an appeal. The provisions of subdivision (c) of this rule govern the suspending, modifying, restoring, or granting of an injunction during the pendency of an appeal.*

\*    \*    \*    \*    \*    \*

(c) Injunction Pending Appeal. *When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party.*

\*    \*    \*    \*    \*    \*

(d) Stay Upon Appeal. *When an appeal is taken the appellant by giving a supersedeas bond may obtain a stay subject to the exceptions contained in subdivision (a) of this rule.* The bond may be given at or after the time of filing the notice of appeal or of procuring the order allowing the appeal, as the case may be. The stay is effective when the supersedeas bond is approved by the court.

Fed.R.Civ.P. 62 (emphasis added). Rule 8 further provides:

Application for a stay of the judgment or order of a district court pending appeal, or for approval of a supersedeas bond, or for

an order suspending, modifying, restoring or granting an injunction during the pendency of an appeal must ordinarily be made in the first instance in the district court. A motion for such relief may be made to the court of appeals or to a judge thereof, but the motion shall show that application to the district court for the relief sought is not practicable, or that the district court has denied an application, or has failed to afford the relief which the applicant requested, with the reasons given by the district court for its action.

F.R.A.P. 8(a).

██ Although the language of Rule 62(c) appears to afford district courts extensive authority to grant injunctive relief pending appeal, courts addressing the issue have construed the rule more narrowly. Several circuits have held that the district court may not alter the injunction once an appeal has been filed except to maintain the status quo of the parties pending the appeal. *See, e.g., Coastal Corp. v. Texas Eastern Corp.,* 869 F.2d 817, 820 (5th Cir.1989); *Flynt Distributing Co., Inc. v. Harvey,* 734 F.2d 1389, 1392 n. 1 (9th Cir.1984); *Lewis v. Tobacco Workers' Int'l Union,* 577 F.2d 1135 (4th Cir.1978); *State of New York v. Nuclear Regulatory Comm'n,* 550 F.2d 745, 758–759 (2d Cir.1977); *Ideal Toy Corp. v. Sayco Doll Corp.,* 302 F.2d 623, 625 (2d Cir.1962). This narrow interpretation of Rule 62(c) derives from *Sayco Doll,* which involved a motion to vacate an injunction based on new evidence brought before the district court while the validity of the injunction was on appeal to the Second Circuit, which held:

> Once the appeal is taken, ... jurisdiction passes to the appellate court. Thereafter the appellant is not usually entitled as of right to present new evidence or argument to the trial court, which in the exercise of a sound discretion will exercise jurisdiction only to preserve the status quo as of the time of appeal. Appellant's proper procedure is then to request leave of the court of appeals to proceed in the lower court. He need not even dismiss his appeal, for we have always been ready to suspend proceedings while new matter was introduced below. But absent permission of the appellate court to reopen, sound judicial administration demands that unless

the judge is satisfied that his order was erroneous he shall use his power under Rule 62(c) only to preserve the status of the case as it sits before the court of appeals.

*Sayco Doll,* 302 F.2d at 625 (citation omitted).

More recently, in *Coastal Corp. v. Texas Eastern Corporation, supra,* the district court granted the plaintiffs' motion for a preliminary injunction, prohibiting the defendants from filing lawsuits challenging a tender offer in other jurisdictions. After the defendants appealed the preliminary injunction order, the trial court dissolved the injunction based on newly discovered evidence. The Fifth Circuit reversed, concluding that Rule 62(c) did not allow the district court to dissolve the injunction and eliminate the appeal. *Coastal,* 869 F.2d at 820. According to the Fifth Circuit, "the powers of the district court over an injunction pending appeal should be limited to maintaining the status quo and ought not to extend to the point that the district court can divest the court of appeals from jurisdiction while the issue is before us on appeal." *Id.*

Two circuits have concluded that, in some circumstances, the district court may alter the status quo by modifying an injunction during the pendency of an appeal. *See Board of Educ. of St. Louis v. State of Missouri,* 936 F.2d 993, 996 (8th Cir.1991) (district court's ongoing supervision of integration of vocational educational programs requires it to retain the broadest discretion possible); *Ortho Pharmaceutical Corp. v. Amgen, Inc.,* 887 F.2d 460, 464 (3d Cir.1989) (district court may alter status quo pursuant to Rule 62(c) if alteration "preserves the integrity" of the appeal). *See also Basicomputer Corp. v. Scott,* 973 F.2d 507, 513 (6th Cir.1992) (declining to rule on issue). In *Ortho,* the plaintiff sought a modification of an injunction while an appeal was pending. The Third Circuit, like the Second and Fifth Circuits, held that Rule 62(c), though purporting to convey extensive authority to the district courts, did not permit a district court unlimited authority to modify a preliminary injunction. The Third Circuit, however, adopted a less narrow construction, holding

that Rule 62(c) authorized the district court to take any of the listed actions as long as such action "preserv[ed] the integrity of the proceedings in the court of appeals." *Ortho*, 887 F.2d at 464. Since the modification requested by the plaintiff would impose additional requirements on the defendant, the district court concluded that the motion to modify transgressed the "status quo" limitation. On appeal, the Third Circuit implicitly agreed that the modification would alter the status quo, but concluded that the modification would preserve the integrity of the appeal by protecting the rights of the plaintiff, which rights were jeopardized in a manner not anticipated by the original injunction. Thus, the Third Circuit concluded that the modification was within the authority provided by Rule 62(c) even though it altered the status quo.

The Tenth Circuit came closest to addressing this issue in *Chief Freight Lines Co. v. Local Union No. 886*, 514 F.2d 572 (10th Cir.1975), in which an employer commenced an action in district court to enjoin a union from striking. On February 27, 1974, the district court judge announced orally in open court that he would enter an order granting the preliminary injunction; the union filed a notice of appeal on March 29, 1974. *Id.* at 578. On April 9 and 10, 1974, the district court heard further evidence and oral argument. The district court judge then entered detailed written findings and conclusions together with an injunctive order on April 10, 1974. *Id.* The union filed a second notice of appeal on April 17, 1994. *Id.* The Tenth Circuit concluded that the district court judge "intended to, and did on February 27, merely announce orally his conclusion to grant the preliminary injunction, but that he did not enter the preliminary injunction until April 10." *Id.* Thus, the Tenth Circuit deemed the written injunctive order of April 10 as the order from which an appeal was taken. *Chief Freight Lines,* however, does not mention Rule 62(c) or *Sayco Doll.* While one commentator suggests that *Chief Freight Lines* implies the Tenth Circuit would follow the majority rule, *see, e.g.,* Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 3921.2 n. 28, I am not convinced that *Chief Freight Lines* provides guidance for the par-

ticular issue presented here. Thus, I conclude that the issue is one of first impression in this circuit.

The two predominant formulas are articulated by *Coastal* and *Ortho.* *Coastal* requires maintenance of the status quo as of the time of appeal, and *Ortho* speaks of preserving the integrity of the appeal. The difference is subtle. *Ortho* recognizes, and *Coastal* fails to recognize, that the status quo itself may cause one of the parties irreparable injury and thereby threaten the appeal. *Ortho,* 882 F.2d at 814. Under such circumstances, it may be necessary to alter the status quo to prevent the injury and preserve the appeal. *Id.* The two formulas, however, have much more in common than in conflict. Regardless of the precise formula used, it is clear that any injunctive action taken pursuant to Rule 62(c) "must be designed to aid the appeal and, accordingly, may not materially alter the status of the case on appeal." A. Ides, *The Authority of a Federal District Court to Proceed After a Notice of Appeal Has Been Filed,* 143 F.R.D. 307, 321–322 (1992). Where, as here, modification of the injunction would not materially alter the status of the case on appeal, either paradigm allows the district court to modify the injunction pursuant to Rule 62(c). Thus, I need not decide between the subtly different formulas.

■ As noted above, the June 10 order requires defendants to "provide financial assurance in the amount of $3,500,000 pursuant to 6 COLO.CODE REGS. 1007–3 § 266 and all applicable subparts." (Ord. of 6/10/98 at 46.) Defendants could have complied with the June 10 order by providing any type of financial assurance allowed by § 266, including a bond, trust, insurance, or any combination thereof. In light of defendants' insufficient trust proposal, however, the United States now moves for issuance of an order requiring defendants to provide a specific form of financial assurance allowed by § 266, a "Surety Bond Guaranteeing Payment into a Closure and/or Post Closure Trust Fund." *See* 6 COLO.CODE REGS. 1007–3 § 266.14(f). The United States' motion can be characterized as either a motion to enforce the June 10 order or as a request for modification of the

order. As noted above, the United States does not raise the issue of contempt. Nor does the United States seek to re-litigate any of the issues presented at the injunction hearing.

If construed as a motion to enforce the June 10 order, this court has continuing jurisdiction to address the United States' motion. *See Tyler v. City of Manhattan,* 118 F.3d 1400, 1402 n. 1 (10th Cir.1997) (district court necessarily retained jurisdiction over parties until they complied with the terms of injunctive order even though injunctive order appealed). If construed as a motion to modify the June 10 order, jurisdiction also exists. The requested modification, if granted, does not materially alter the status of the appeal. Nor would granting the modification deprive or otherwise affect the jurisdiction of the Tenth Circuit over the appeal.

As no risk of interference exists, I conclude that this court has jurisdiction to entertain the United States' motion to enforce or modify the injunction. I also conclude that this court retains jurisdiction to proceed with the action on the merits. *See State of Colorado v. Idarado Mining Co.,* 916 F.2d at 1490. Lastly, I conclude that the June 10 order, as an interlocutory order granting mandatory injunctive relief, is not automatically stayed by defendant's notice of appeal. Fed.R.Civ.P. 62(a); Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2904. Thus, the June 10 order remains in effect. Contrary to the United States' assertion (Plf.'s Mot. Vacate Sched. at 4, 8), the order need not be "restored." Accordingly, I address the merits of the United States' motion. I also vacate my previous order, entered in open court on August 6, 1998, establishing a briefing schedule regarding the issue of continuing jurisdiction.

### IV. ANALYSIS OF THE UNITED STATES' MOTION TO ENFORCE OR MODIFY

█ The United States requests the issuance of an order directing defendants to obtain financial assurances in the form of a surety bond in the amount of $3,500,000 that complies with the provisions of 6 COLO.CODE REGS. 1007-3 § 266.14(f) ("Surety Bond Guaranteeing Payment into a Closure and/or Post Closure Trust Fund"). Considering the insufficiency and insecurity of defendants' proposed trust arrangement, the delay in compliance with the June 10 order caused thereby, and defendants' failure to respond adequately to the insufficiencies raised by the United States in its response to defendants' Show Cause Submission, I grant the United States' motion. Requiring defendants to provide financial assurance in the form of a proper surety bond will likely avoid further delay, provide clarity of purpose, and does not alter the status of the appeal.

Additionally, I attach to this order the documents attached to the United States' motion as Attachments A, B, and C. "Attachment A" describes the United States' requirements for the surety bond and standby trust to be obtained by defendants. "Attachment B" is a proposed draft of the surety bond instrument. "Attachment C" is a proposed draft of the standby trust agreement. I find and conclude that the stated requirements and the proposed drafts are reasonable and fair. The stated requirements and the proposed drafts also appear to comply with 6 COLO.CODE REGS. 1007-3 § 266.14(f). Accordingly, the surety bond and standby trust created by defendants shall comply with the requirements stated in the attachments and 6 COLO.CODE REGS. 1007-3 § 266.14(f). Further, the final drafts of the bond instrument and the standby trust agreement shall mimic the proposed drafts. The United States and defendants may, by stipulation, vary these requirements and terms. Such stipulation must be approved by the court.

Accordingly, I ORDER that:

(1) the briefing schedule regarding continuing jurisdiction, established in open court on August 6,1998, is VACATED;

(2) the hearing set for October 2, 1998 at 3:30 p.m. is VACATED; and

(3) defendants SHALL PROVIDE financial assurances in the amount of $3,500,000 in the form of a surety bond guaranteeing payment into a closure and/or post-closure trust fund pursuant to 6 COLO.CODE REGS. 1007-3 § 266.14(f);

(4) the surety bond and standby trust shall comply, as set forth above with more particularity, with Attachments A, B, and C to this order;

(5) plaintiff and defendants may vary the requirements and terms of Attachments A, B, and C only by stipulation after approval by the court; and

(6) defendants shall so comply within twenty days or show good cause as to why they have not achieved such compliance.

## ATTACHMENT A

### With respect to the surety bond:

The Defendants must obtain a surety bond ("the bond") which conforms to the requirements of the Order and must submit the bond to EPA within ____ days after the effective date of the Order.

2. The wording in the bond must be identical to the wording in the bond format provided in Attachment B.

3. The bond must be effective as of the day Defendants submit the bond to EPA. The surety company issuing the bond and any co-sureties must, at a minimum, be among those listed as acceptable sureties on Federal bonds in Circular 570 of the U.S. Department of the Treasury. If the surety is using reinsurance, a Treasury reinsurance form must be submitted with the bond of within 45 days thereafter. If co-sureties are being used, the original bond must reflect that fact.

4. The Defendants must also establish a standby trust fund as provided in 6 CCR 1007–3 §§ 266.14(f) and 266.14(a) ("Surety Bond Guaranteeing Payment into a Closure and/or Post Closure Trust Fund" and "Closure and/or Post Closure Trust Fund"), except that the trust shall run to the benefit of EPA. Under the terms of the bond, all payments made thereunder shall be deposited by the surety directly into the standby trust fund in accordance with the instructions from EPA. Defendants shall submit an originally signed duplicate of the trust agreement to EPA with the surety bond on the same day the trust agreement is fully executed. Only one standby trust shall be executed, although all defendants may be grantors.

5. The bond must guarantee that Defendants will:

(i) Fund the standby trust in an amount equal to the penal sum of the bond prior to the beginning of final closure of the facility; or

(ii) Fund the standby trust fund in an amount equal to the penal sum within 15 days after an order to begin closure is issued by CDPHE, EPA, or a State court or other court of competent jurisdiction; or

(iii) Provide alternate financial assurance as provided in 6 CCR 1007–3 § 266, Subpart A, and obtain EPA's written approval of the assurance provided, within 90 days after receipt by both Defendants and EPA of a notice of cancellation of the bond from the surety.

6. The penal amount of the bond must be three million five hundred thousand U.S. dollars (U.S. $ 3,500,000.00) or more.

7. Under the terms of the bond, the surety may cancel the bond by sending notice of cancellation by certified mail to Defendants and to EPA. Cancellation may not occur, however, during the 120 days beginning on the date of receipt of the notice of cancellation by both Defendants and EPA, as evidenced by the return receipts.

8. Defendants may cancel the bond if EPA has given prior written consent based on its receipt of evidence of alternate financial assurance as specified in 6 CCR 1007–3 § 266, Subpart A.

### With respect to the standby trust:

1. Defendants must submit an originally signed duplicate of the trust agreement to EPA within ____ days after the effective date of the Court's order.

2. The trustee must be an entity which has the authority to act as a trustee and whose trust operations are regulated and examined by a Federal or State agency.

3. The wording of the trust agreement must be identical to the wording specified in Attachment C. Schedule A of the trust agreement must be updated within 60 days after a change in the amount of the cur-

rent closure and/or post-closure cost estimate covered by the agreement.

4. Whenever the current closure and/or post-closure cost estimate changes, Defendants must compare the new cost estimate with the trustee's most recent annual valuation of the trust fund. If the value of the fund is less than the amount of the new estimate, Defendants, within 60 days after the change in the cost estimate, must either deposit an amount into the fund so that its value after this deposit at least equals the amount of the current closure and/or post-closure cost estimate, or obtain other financial assurance as specified in this section to cover the difference.

5. If the value of the trust fund is greater than the current amount of the current closure and/or post-closure cost estimate, Defendants may submit a written request to EPA for the release of the amount in excess of the current closure and/or post-closure cost estimate.

6. If Defendants substitute other financial assurance as specified in Section 266 for all or part of the trust fund, they may submit a written request to EPA for release of the amount in excess of the $3,500,000.00 covered by the trust fund less closure or post-closure costs already paid by the trust fund.

7. Within 60 days after receiving a request from Defendants for release of funds as specified in paragraphs 5 or 6 above, EPA will instruct the trustee to release to Defendants such funds as EPA specifies in writing.

8. Closure and post-closure care reimbursements:

   (i) After beginning partial or final closure, Defendants or another person authorized to conduct partial or final closure may request reimbursements for partial or final closure expenditures by submitting itemized bills to EPA. Defendants may request reimbursements for partial closure only if sufficient funds are remaining in the trust fund to cover the maximum costs of closing the facility over its remaining operating life. Within 60 days after receiving bills for partial or final closure activities, EPA will instruct the trustee to make reimbursements in those amounts as EPA specifies in writing, if EPA determines that the partial or final closure expenditures are in accordance with the approved closure plan, or otherwise justified. If EPA has reason to believe that the maximum cost of closure over the remaining life of the facility will be significantly greater than the value of the trust fund, it may withhold reimbursements of such amounts as it deems prudent until it determines, in accordance with 266.14(1) that Defendants are no longer required to maintain financial assurance for final closure of the facility. IF EPA does not instruct the trustee to make such reimbursements, it will provide Defendants with a detailed written statement of reasons.

   (ii) During the period of post-closure care, EPA may approve a release of funds if Defendants demonstrate to EPA that the value of the trust fund exceeds the remaining cost of post-closure care.

   (iii) Defendants or any other person authorized to conduct post-closure care may request reimbursements for post-closure care expenditures by submitting itemized bill to EPA. Within 60 days after receiving bills for post-closure care activities, EPA will instruct the trustee to make reimbursements in those amounts as EPA specifies in writing, if EPA determines that the post-closure care expenditures are in accordance with the approved post-closure plan or otherwise justified. If EPA does not instruct the trustee to

make such reimbursements, it will provide Defendants with a detailed written statement of reasons.

9. EPA will agree to termination of the trust when:

(i) Defendants substitute alternate financial assurance as specified in 6 CCR 1007–3 § 266, Subpart A; or

(ii) EPA releases Defendants from the requirements of Section 266 in accordance with 6 CCR 1007–3 § 266.14(1).

## ATTACHMENT B
## FINANCIAL GUARANTEE BOND

Date bond executed: _____

Effective date: _____

Principal: [Legal name and business address of owner or operator]

Type of organization: [Insert "individual", "joint venture", "partnership", or "corporation"]

State of incorporation: _____

Surety(ies): [Name(s) and business address(es) ]

EPA ID No.: COD007060999
Power Engineering Company
2525  Delaware Street
Denver, Colorado

Remediation Amount: US $3,500,000.00

Total penal sum of bond: US $3,500,000.00

Surety's bond number: _____

Know All Persons By These Presents, That we, the Principal and Surety(ies) hereto are firmly bound to the United States Environmental Protection Agency ("EPA") in the above penal sum for the payment of which we bind ourselves, our heirs, executors, administrators, successors, and assigns jointly and severally; provided that, where the Surety(ies) are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" only for the purpose of allowing a joint action or action against any or all of us, and for all other purposes each Surety binds itself, jointly and severally with the Principal, for the payment of such sum only as is set forth opposite the name of such Surety, but if no limit of liability is indicated, the limit of liability shall be the full amount of the penal sum.

Whereas said Principal is required, under the Colorado Hazardous Waste Management Regulations, to have a permit or interim status in order to own or operate each hazardous waste management facility identified above, and

Whereas said Principal is required to provide financial assurance for closure, or closure and post-closure care, as a condition of the permit or interim status, and

Whereas said Principal shall establish a standby trust fund as is required when a surety bond is used to provide such financial assurance, unless an alternate mechanism has been established by the State of Colorado to directly receive monies.

Now, Therefore, the conditions of the obligation are such that if the Principal shall faithfully, before the beginning of final closure of each facility identified above, fund the standby trust fund in the amount(s) identified above for the facility.

Or, if the Principal shall fund the standby trust fund in such amount(s) within 15 days after an order to begin closure is issued by the Colorado Department of Public Health

and Environment ("the Department") or EPA or a U.S. district court or other court of competent jurisdiction,

Or, if the Principal shall provide alternate financial assurance, as specified in these regulations and obtain EPA's written approval of such assurance, within 90 days after the date notice of cancellation is received by both the Principal and EPA from the Surety(ies), then this obligation shall be null and void, otherwise it is to remain in full force and effect.

The Surety(ies) shall become liable on this bond obligation only when the Principal has failed to fulfill the conditions described above. Upon notification by EPA that the Principal has failed to perform as guaranteed by this bind, the Surety(ies) shall place funds in the amount guaranteed for the facility(ies) into the standby trust fund as directed by EPA.

The liability of the Surety(ies) shall not be discharged by any payment or succession of payments hereunder, unless and until such payment or payments shall amount in the aggregate to the penal sum of the bond, but in no event shall the obligation of the Surety(ies) hereunder exceed the amount of said penal sum.

The Surety(ies) may cancel the bond by sending notice of cancellation by certified mail to the Principal and to EPA, provided, however, that cancellation shall not occur during the 120 days beginning on the date of receipt of the notice of cancellation by both the Principal and EPA, as evidenced by the return receipts.

The Principal may terminate this bond by sending written notice to the Surety(ies), provided, however, that no such notice shall become effective until the Surety(ies) receive(s) written authorization for termination of the bond by EPA.

In Witness Whereof, the Principal and Surety(ies) have executed this Financial Guarantee Bond and have affixed their seals on the date set forth above.

The persons whose signatures appear below hereby certify that they are authorized to execute this surety bond on behalf of the Principal and Surety(ies) and that the wording of this surety bond is identical to the wording specified in 6 CCR 1007–3 § 266.18(f) as such regulations were constituted on the date this bond was executed, with the exception of the substitution of EPA for the Colorado Department of Public Health and Environment.

## Principal

[Signature(s) ]

[Name(s) ]

[Title(s) ]

[Corporate seal]

## Corporate Surety(ies)

[Name and address]

State of incorporation: _____

Liability limit: $_____

[Signature(s) ]

[Name(s) and Title(s) ]

[Corporate seal]

[For every co-surety, provide signature(s), corporate seal, and other information in the same manner as for Surety above.]

Bond premium:                    $_____

---

## ATTACHMENT C

### TRUST AGREEMENT

Trust Agreement, the "Agreement", entered into as of [date] by and between [name of the owner or operator], a [name of State][insert "corporation", "partnership", "association", or "proprietorship"], the "Grantor", and [name of Corporate trustee], [insert "incorporated in the State of Colorado" or "a national bank"], the "Trustee."

Whereas, the Colorado Department of Public Health and Environment, Hazardous Materials and Waste Management Division, a regulatory Agency of the State of Colorado, has established certain regulations applicable to the Grantor, requiring that an owner or operator of a hazardous waste management facility shall provide assurance that funds will be available when needed for closure and/or post-closure care of the facility,

Whereas, the Grantor has elected to establish a trust to provide all or a part of such financial assurance for the facilities identified herein,

Whereas, the Grantor, acting through its duly authorized officers, has selected the Trustee to be the trustee under this Agreement, and the Trustee is willing to act as trustee,

Now, Therefore, the Grantor and the Trustee agree as follows:

### Section 1.   Definitions.

As used in this Agreement:

(a) The term "Grantor" means the owner or operator who enters into this Agreement and any successors or assigns of the Grantor.

(b) The term "Trustee" means the Trustee who enters into this Agreement and any successor Trustee.

### Section 2.   Identification of Facilities and Cost Estimates.

This Agreement pertains to the facilities and cost estimates identified on attached Schedule A [on Schedule A, for each facility list the EPA Identification Number, name, address, and the current closure and/or post-closure cost estimates, or portions thereof, for which financial assurance is demonstrated by this Agreement].

### Section 3.   Establishment of Fund.

The Grantor and the Trustee hereby establish a trust fund, the "Fund", for the benefit of the United States Environmental Protection Agency ("EPA"). The Grantor and the Trustee intend that no third party have access to the Fund except as herein provided. The Fund is established initially as consisting of the property which is acceptable to the Trustee, described in Schedule B attached hereto. Such property and any other property subsequently transferred to the Trustee is referred to as the Fund, together with all earnings and profits thereon, less any payments or distributions made by the Trustee pursuant to this Agreement. The Fund shall be held by the Trustee, In Trust, as hereinafter provided. The Trustee shall not be responsible nor shall it undertake any responsibility for the amount or adequacy of, nor any duty to collect from the Grantor, any payments necessary to discharge any liabilities of the Grantor established by EPA.

### Section 4.   Payment for Closure and Post–Closure Care.

The Trustee shall make payments from the Fund as EPA shall direct, in writing, to provide for the payment of the costs of closure and/or post-closure care of the facilities covered by this Agreement. The Trustee

shall reimburse the Grantor or other persons specified by EPA from the Fund for closure and post-closure expenditures in such amount as EPA shall direct in writing. In addition, the Trustee shall refund to the Grantor such amounts as EPA specifies in writing. Upon refund, such funds shall no longer constitute part of the Fund as defined herein.

### Section 5. Payment Comprising the Fund.

Payments made to the Trustee for the Fund shall consist of cash or securities acceptable to the Trustee.

### Section 6. Trustee Management.

The Trustee shall invest and reinvest the principal and income of the Fund and keep the Fund invested as a single fund, without distinction between principal and income, in accordance with general investment policies and guidelines which the Grantor may communicate in writing to the Trustee from time to time, subject, however, to the provisions of this Section. In investing, reinvesting, exchanging, selling, and managing the Fund, the Trustee shall discharge his/her duties with respect to the trust fund solely in the interest of the beneficiary and with the care, skill, prudence, and diligence under the circumstances then prevailing which persons of prudence, acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with like aims; **EXCEPT THAT:**

(i) Securities or other obligations of Grantor, or any other owner or operator of the facilities, or any of their affiliates as defined in the Investment Company Act of 1940, as amended, 15 U.S.C. 80a–2.(a), shall not be acquired or held, unless they are securities or other obligations of the Federal or a State government;

(ii) The Trustee is authorized to invest the Fund in time or demand deposits of the Trustee, to the extent insured by an agency of the Federal or State government; and

(iii) The Trustee is authorized to hold cash awaiting investment or distribution uninvested for a reasonable time and without liability for the payment of interest thereon.

### Section 7. Commingling and Investment.

The Trustee is express authorized in its discretion:

(a) To transfer from time to time any or all of the assets of the Fund to any common, commingled, or collective trust fund created by the Trustee in which the Fund is eligible to participate, subject to all of the provisions thereof, to be commingled with the assets of other trusts participating therein; and

(b) To purchase shares in any investment company registered under the Investment Company Act of 1940, 15 U.S.C. 80a–1 *et seq.*, including one which may be created, managed, underwritten, or to which investment advice is rendered or the shares of which are sold by the Trustee. The Trustee may vote such shares in its discretion.

### Section 8. Express Powers of Trustee.

Without in any way limiting the powers and discretions conferred upon the Trustee by the other provision of this Agreement or by law, the Trustee is expressly authorized and empowered:

(a) To sell, exchange, convey, transfer, or otherwise dispose of any property held by it, by public or private sale. No person dealing with the Trustee shall be bound to see to the application of the purchase money or to inquire into the validity or expediency of any such sale or other disposition;

(b) To make, execute, acknowledge, and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

(c) To register any securities held in the Fund in its own name or in the name of a nominee and to hold any security in bearer form or in book entry, or to combine certificates representing such securities with certificates of the same issue held by the Trustee in other fiduciary capacities, or to deposit or arrange for the deposit of such securities in a qualified central depository even though, when so deposited, such securities may be merged and held in bulk in the name of the nominee of such depository with other securities deposited therein

by another person, or to deposit or arrange for the deposit of any securities issued by the United States Government, or any agency or instrumentality thereof, with a Federal Reserve bank, but the books and records of the Trustee shall at all times show that all such securities are part of the Fund;

(d) To deposit any cash in the Fund in interest-bearing accounts maintained or savings certificates issued by the Trustee, in its separate corporate capacity, or in any other banking institution affiliated with the Trustee, to the extent insured by an agency of the Federal or State government; and

(e) To compromise or otherwise adjust all claims in favor of or against the Fund.

### Section 9. Taxes and Expenses.

All taxes of any kind that may be assessed or levied against or in respect of the Fund and all brokerage commissions incurred by the Fund shall be paid from the Fund. All other expenses incurred by the Trustee in connection with the administration of this Trust, including fees for legal services rendered to the Trustee, the compensation of the Trustee to the extent not paid directly by the Grantor, and all other proper charges and disbursements of the Trustee shall be paid from the Fund.

### Section 10. Annual Valuation.

The Trustee shall annually, at least 30 days prior to the anniversary date of establishment of the Fund, furnish to the Grantor and to EPA a statement confirming the value of the Trust. Any securities in the Fund shall be valued at market value as of no more than 60 days prior to the anniversary sate of establishment of the Fund. The failure of the Grantor to object in writing to the Trustee within 90 days after the statement has been furnished to the Grantor and EPA shall constitute a conclusively binding assent by the Grantor, barring the Grantor from asserting any claim or liability against the Trustee with respect to matters disclosed in the statement.

### Section 11. Advice of Counsel.

The Trustee may from time to time consult with counsel, who may be counsel to the Grantor, with respect to any question arising as to the construction of this Agreement or any action to be taken hereunder. The Trustee shall be fully protected, to the extent permitted by law, in acting upon the advice of counsel.

### Section 12. Trustee Compensation.

The Trustee shall be entitled to reasonable compensation for its services as agreed upon in writing from time to time with the Grantor.

### Section 13. Successor Trustee.

The Trustee may resign or the Grantor may replace the Trustee, but such resignation or replacement shall not be effective until the Grantor has appointed a successor trustee and this successor accepts the appointment. The successor trustee shall have the same powers and duties as those conferred upon the Trustee hereunder. Upon the successor trustee's acceptance of the appointment, the Trustee shall assign, transfer and pay over to the successor trustee the funds and properties then constituting the Fund. If for any reason the Grantor cannot or does not act in the event of the resignation of the Trustee, the Trustee may apply to a court of competent jurisdiction for the appointment of a successor trustee or for instructions. The successor trustee shall specify the date on which it assumes the administration of the trust in writing sent to the Grantor, EPA, and the present Trustee by certified mail 10 days before such change becomes effective. Any expenses incurred by the Trustee as a result of any of the acts contemplated by this Section shall be paid as provided in Section 9.

### Section 14. Instructions to the Trustee.

All orders, requests, and instructions by the Grantor to the Trustee shall be in writing, signed by such persons as are designated in the attached Exhibit A or such other designees as the Grantor may designate by amendment to Exhibit A. The Trustee shall be fully protected in acting without inquiry in accordance with the Grantor's orders, re-

quests, and instructions. All orders, requests, and instructions by EPA to the Trustee shall be in writing, signed by the EPA Regional Administrator or his/her designees, and the Trustee shall act and shall be fully protected in acting in accordance with such orders, requests, and instructions. The Trustee shall have the fight to assume, in the absence of written notice to the contrary, that no event constituting a change or a termination of the authority of any person to act on behalf of the Grantor or EPA hereunder has occurred. The Trustee shall have no duty to act in ·the absence of such orders, requests, and instructions from the Grantor and/or EPA, except as provided for herein.

### Section 15. Notice of Nonpayment.

[Deleted]

### Section 16. Standby Trust Exemptions.

Unless this trust fund is funded pursuant to the requirements of Part 266 of the Colorado Hazardous Waste Regulations 6 CCR 1007–3, as amended, updating of Schedule A hereto as current closure or post-closure costs shall not be required, nor shall annual valuations under Section 10 be required.

### Section 17. Amendment of Agreement.

This Agreement may be amended by an instrument in writing executed by the Grantor, the Trustee, and EPA, or by the Trustee and EPA if the Grantor ceases to exist.

### Section 18. Irrevocability and Termination.

Subject to the right of the parties to amend this Agreement as provided in Section 16, this Trust shall be irrevocable and shall continue until terminated at the written agreement of the Grantor, the Trustee and EPA, or by the Trustee and EPA, if the Grantor ceases to exist. Upon termination of the Trust, all remaining trust property, less final trust administration expenses, shall be delivered to the Grantors.

### Section 19. Immunity and Indemnification.

The Trustee shall not incur personal liability of any nature in connection with any act or omission, made in good faith, in the administration of this Trust, or in carrying out any directions by the Grantor or EPA issued in accordance with this Agreement. The Trustee shall be indemnified and saved harmless by the Grantor or from the Trust Fund, or both, from and against any personal liability to which the Trustee may be subjected by reason of any act or conduct in its official capacity, including all expenses reasonably incurred in its defense in the event the Grantor fails to provide such defense.

### Section 20. Choice of Law.

This Agreement shall be administered, construed, and enforced according to the laws of the State of Colorado.

### Section 21. Interpretation.

As used in this Agreement, words in the singular include the plural and words in the plural include the singular. The descriptive headings for each Section of this Agreement shall not affect the interpretation or the legal efficacy of this Agreement.

In Witness Whereof the parties have caused this Agreement to be executed by their respective officers duly authorized and their corporate seals to be here unto affixed and attested as of the date first above written: The parties below certify that the wording of this Agreement is identical to the wording specified in § 266.18(a)(1) as such regulations were constituted on the date first above written, with the exception of the substitution of EPA for the Colorado Department of Public Health and Environment and the deletion of Section 15 (Notice of Nonpayment).

---

[Signature of Grantor]
[Title]
[Seal]

---

Attest: [Signature of Attestor]
[Title]

---

[Signature of Trustee]
[Name of Trustee]
[Title]
[Seal]

---

Attest: [Signature of Attestor]
[Title]

State of _____

County of _____

On this [date], before me personally came [owner or operator] to me known, who, being by me duly sworn, did depose and say that she/he resides at [address], that she/he is [title] of [corporation], the corporation described in and which executed the above instrument; that she/he knows the seal of said corporation; that the seal affixed to such instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation, and that she/he signed her/his name thereto by like order.

[Signature of Notary Public]