**UNITED STATES of America,**
**Plaintiff,**

v.

**POWER ENGINEERING COMPANY,**
**Redoubt, Ltd. and Richard J.**
**Lilienthal, Defendants.**

**No. CIV.A. 97–B–1654.**

United States District Court,
D. Colorado.

Nov. 24, 2000.

Stephen D. Taylor, United States Attorney's Office, Civil Division, Denver, CO, John N. Moscato, U.S. Department of Justice, Environment & Natural Resources Division, Denver, CO, David E. Street, U.S. Department of Justice, Environmental Enforcement Section, Environment and Natural Resources Division, Washington, DC, for USA, plaintiffs.

John F.X. McBride, John Joseph Zodrow, Zodrow, et al., P.C., Denver, CO, for Power Engineering Co., Redoubt, Ltd.

Robert T. McAllister, McAllister & Murphy, P.C., Denver, CO, for Richard J. Lilienthal.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

Plaintiff moves for partial summary judgment on the question whether Defendants must post financial assurances under Colorado regulations. Plaintiff concedes that there are genuine issues of material fact regarding the proper amount of those financial assurances and, accordingly, summary judgment is inappropriate on that question. Defendants cross-move for summary judgment. The motions are adequately briefed, and argued. For the reasons set forth below, I grant Plaintiff's motion, and deny Defendants' motion. Jurisdiction exists under 28 U.S.C. § 1331.

### I.

The following facts are undisputed unless otherwise noted. From approximately 1968 to the present, Defendants have operated a metal refinishing/chrome electroplating business at 2525 South Delaware Street in Denver, Colorado (Facility). The business specializes in stripping and refinishing crankshafts, connecting rods, and rod journals for large diesel engines used in heavy equipment. The process of stripping produces thirteen different waste streams and more than 1000 kilograms of hazardous waste per month as defined under the Resource Conservation and Recovery Act (RCRA). See 42 U.S.C. § 6901 et seq. The wastes in these streams that exceed the regulatory toxicity standards include arsenic, lead, mercury, and hexavalent chromium contaminated material.

In 1986, Defendant Power Engineering Company (PEC) notified the Colorado Department of Public Health and the Environment (CDPHE) that it was a generator of four different types of hazardous waste, but neither listed chromium as a constituent part of the waste generated, nor indicated that Defendant PEC treated, stored, or disposed of the wastes at its South Delaware Street facility. In 1992, the CDPHE learned of a discharge into the Platte River of high levels of hexavalent chromium. Soon thereafter, the CDPHE began a series of compliance evaluation inspections that continued through 1994. As a result of these inspections, the CDPHE discovered that Defendant PEC had been treating, storing, and disposing of hazardous wastes without either the proper state or federal permits, or attaining "interim status" under 42 U.S.C. § 6925(e)(1) which allows continued operations during the pendency of an application for a federal permit. In addition, the CDPHE learned that chromium emanating from Defendant PEC's place of business had contaminated groundwater both under, and under areas outside of, its place of business. On March 10, 1993, Defendant PEC notified the CDPHE that in addition to one of the wastes identified in its 1986 notification, it also generated five other hazardous wastes. On June 11, 1993, the CDPHE issued a notice of violation to Defendant PEC indicating that it had been improperly treating storing, and disposing of hazardous wastes.

In July 1994, the CDPHE issued an Initial Compliance Order, but stayed its execution so as to discuss the order with Defendants. These discussions took place from September 1994 to June 1996. In June 1996, the CDPHE issued a Final Administrative Compliance Order which requires Defendant PEC to: (1) immediately comply with applicable hazardous waste laws; (2) refrain from the treatment, storage, and disposal of hazardous wastes without obtaining Interim Status or the proper permit(s); (3) properly manage wastes; (4) submit for review and approval plans for weekly inspections of hazardous waste containers; (5) submit a complete 1990/1991 Biennial Report reflecting all hazardous wastes generated, treated, stored, and disposed of during those years; (6) submit an updated 1992/1993 Biennial Report including waste codes applicable to off-site disposal; (7) implement the "Removal Plan for Chrome Contaminated Stockpiled Soils"; (8) submit for review

and approval a soil characterization and groundwater sampling work plan; (9) submit for review and approval a corrective measure study plan evaluating remedial alternatives to prevent, mitigate, and remediate the releases from the Facility; and (10) within thirty days of CDHPE approval of the corrective measure study, implement the remedial alternative.

Defendant PEC did not appeal this order, but also failed to implement its requirements. Consequently, the CDPHE issued an Administrative Penalty Order assessing civil penalties of $1.13 million. When Defendant PEC also failed to comply with the Administrative Penalty Order, the CDPHE brought suit in state court on August 1, 1997 seeking to force Defendant PEC to comply with both the Final Administrative Compliance Order, and the Administrative Penalty Order. *See Plaintiff's Cross–Motion for Summary Judgment*, Ex. A. On March 22, 1999, a Colorado state court held that the Final Administrative Compliance Order, and the Administrative Penalty Order are enforceable as a matter of law. *See id.*, Ex. D.

Although the CDPHE had the authority to demand financial assurances, the Final Administrative Compliance Order did not require them. Plaintiff asked the CDPHE to enforce the financial assurance requirements of the RCRA and corresponding Colorado regulations with respect to Defendants. Plaintiff also informed the CDPHE that if it did not, Plaintiff would seek its own enforcement action. *See Plaintiff's Response*, Ex. 8 (letter dated August 26, 1996 informing the CDPHE that its actions with respect to Defendant PEC had not been "timely and/or appropriate," and that unless the CDPHE so acted, Plaintiff would seek to enforce the RCRA itself); *Plaintiff's Motion for Summary Judgment*, Ex. 25 (affidavit of Carol Rushin, Assistant Regional Administrator, Office of Enforcement, Compliance and Environmental Justice, EPA, that subsequent to the August 26, 1996 letter Plain-

tiff informed the CDPHE that its failure to seek financial assurances was inappropriate). Because the CDPHE failed to so act, and because Plaintiff believed Defendant Lilienthal was seeking to divest himself of, or otherwise insulate, his assets and might "leave the country, declare bankruptcy, or liquidate Defendant PEC," Plaintiff filed this action on August 1, 1997. Plaintiff alleged eight claims: (1) treatment of hazardous waste without a permit or interim status; (2) disposal of hazardous waste without a permit or interim status; (3) shipment of hazardous waste to an unpermitted facility; (4) improper container management; (5) storage of hazardous waste without a permit or interim status; (6) failure to provide employee training; (7) failure to have a hazardous waste contingency plan; and (8) illegal operations (failure to have a groundwater monitoring program, failure to have a closure plan, failure to minimize releases of hazardous waste, and failure to obtain and provide financial assurances for closure and post-closure). Plaintiff also alleged that Power Engineering has failed to comply with CDPHE's Administrative Compliance Order.

After a preliminary injunction hearing at which Walter Avramenko, a CDPHE employee, testified that Colorado supports Plaintiff's action to obtain financial assurances, I granted Plaintiff's motion for preliminary injunction on June 10, 1998, and ordered Defendants to "provide financial assurance in the amount of $3,500,000 pursuant to 6 COLO. CODE REGS. 1007–3 § 266 and all applicable subparts." *U.S. v. Power Engineering Co.*, 10 F.Supp.2d 1145, 1165 (D.Colo.1998). On July 22, 1998, Defendants appealed my June 10, 1998 ruling. On August 17, 1998, after a dispute over the form the financial assurances would take, I ordered Defendants to post "a surety bond guaranteeing payment into a closure and/or post closure trust fund" pursuant to 6 COLO. CODE REGS. 1007–3 § 266.14(f). *U.S. v. Power Engineering Co.*, 10 F.Supp.2d 1165, 1172

(D.Colo.1998). On September 24, 1998, I modified the August 17, 1998 Memorandum Opinion and Order so that Defendants could provide financial assurances in accordance with any subpart of Section 266 if Plaintiff so agreed.

On October 15, 1998, Defendants filed a Show Cause Submittal arguing that "they are not able to obtain financial assurances in the amount of Three Million Five Hundred Thousand Dollars because there is no third party willing to extend credit to Defendants to secure the obligations of a third party financial institution issuing such financial assurances." Plaintiff opposed the Show Cause Submittal, and moved to both hold Defendants in contempt, and impose sanctions. On November 24, 1998, Defendants moved to modify the preliminary injunction. In that motion, Defendants claimed that the $3,500,000 estimate of the cost of remediation undertaken at the May 11–13, 1998 hearing was inaccurate. Instead, Defendants claimed that "[b]ased upon the work performed by PEC and its consultants after the May hearing, the information now available to PEC, and the current plans for remediation of contaminated groundwater and soils," the cost of remediation would only be $575,500. Defendants thus moved to modify my June 10, 1998 Memorandum Opinion and Order to require Defendants to provide financial assurances of only $575,500.

On February 25, 1999, Plaintiff moved for partial summary judgment on the question of the liability of Defendants. On March 17, 1999, Defendants responded to Plaintiff's motion, and cross-moved for summary judgment. The central basis for Defendants' cross-motion is that Plaintiff does not have the authority to "overfile" a state enforcement action. Overfiling is nowhere defined by statute or regulation but is said to occur when the federal government initiates an enforcement action after a state government begins an action on the same matter.

On July 13, 1999, I denied without prejudice Defendants' motion to modify preliminary injunction, and Plaintiff's motion for partial summary judgment. In that order, I stated that "the opinion of the Tenth Circuit will probably have material bearing upon the issues remaining, including the issues raised by the parties in their motions for summary judgment. It is likely that further briefing on the motions for summary judgment on the motions for summary judgment will be required, in light of the Tenth Circuit's opinion on appeal."

On September 8, 1999, the Tenth Circuit issued its decision. *See U.S. v. Power Eng'g Co.*, 191 F.3d 1224 (10th Cir.1999). In that decision, the Tenth Circuit did not decide the "overfile" issue raised by Defendants in their cross-motion. Instead, it merely "assume[d] without deciding ... that the EPA may [overfile] even after the state has taken its own enforcement actions." *Id.* at 1229. On January 19, 2000, Defendants filed a petition for writ of certiorari in the United States Supreme Court which was denied on April 24, 2000.

On September 11, 2000, both parties filed a joint stipulation regarding amendment of complaint, and briefing schedule for summary judgment in which they requested that: (1) Plaintiff be permitted to amend its complaint to eliminate all of its claims except that regarding financial assurances; (2) the motion for partial summary judgment, and cross-motion for summary judgment be withdrawn; and (3) both parties be permitted to file new Rule 56 motions. After I approved the joint stipulation the parties filed their present cross-motions for summary judgment.

## II.

Rule 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The

very purpose of a summary judgment motion is to assess whether a trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, that demonstrate the absence of genuine issues for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992).

■ Once a properly supported summary judgment motion is made, the nonmoving party has the burden of showing that issues of undetermined material fact exist. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. In so doing, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980); Fed.R.Civ.P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Unsupported allegations "without any significant probative evidence tending to support he complaint" are insufficient, *White*, 45 F.3d at 360 (internal quote and citation omitted), as are conclusory assertions that factual disputes exist. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where, as here, the parties file cross motions for summary judgment, I assume that no evidence need be considered other than that filed by the parties. *James Barlow Family Ltd. Partnership v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir.1997). Nevertheless, summary judgment is inappropriate if genuine issues of material fact exist. *Id.*

In ruling on summary judgment, I must view the factual record and reasonable inferences therefrom in the light most favorable to the nonmoving party. *See id.* If no reasonable juror could find for the nonmoving party based on the evidence present in the motion and response, then summary judgment is proper and a trial is unnecessary. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment should not enter if a reasonable trier of fact could return a verdict for the nonmoving party. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505; *Mares*, 971 F.2d at 494.

### III.

### A.

In their cross-motion, Defendants argue that Plaintiff's *Amended Complaint* must be dismissed because: (1) subject matter jurisdiction does not exist; (2) the Eighth Circuit's reasoning in *Harmon Indus., Inc. v. Browner*, 191 F.3d 894 (8th Cir.1999) that the RCRA prohibits "overfiling" is applicable here; and (3) the doctrine of *res judicata* precludes Plaintiff's action. Plaintiff responds that: (1) subject matter jurisdiction exists under 28 U.S.C. §§ 1331, 1345; (2) *Harmon* is distinguishable on its facts, and incorrectly decided; and (3) *res judicata* is inapplicable. I address each question in turn.

### 1.

Defendants' argument that 28 U.S.C. §§ 1331, 1345 do not confer subject matter jurisdiction is unpersuasive. 28 U.S.C. § 1331 states: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Under Tenth Circuit authority, "[a] case 'arises' under the laws of the United States if it clearly and substantially involves a dispute or controversy respecting the validity, construction or effect of such laws which is determinative of the resulting judgment." *Mountain Fuel Supply Co. v. Johnson*, 586 F.2d 1375, 1381 (10th Cir.1978), *cert. denied*, 441 U.S. 952, 99 S.Ct. 2182, 60

L.Ed.2d 1058 (1979) (citing *Shulthis v. McDougal,* 225 U.S. 561, 32 S.Ct. 704, 56 L.Ed. 1205 (1912)). As discussed in detail below, this case involves a "controversy respecting the [ ] construction or effect" of the RCRA "which is determinative of the resulting judgment." *Mountain Fuel Supply,* 586 F.2d at 1381. Consequently, I have subject matter jurisdiction pursuant to Section 1331.

■ 28 U.S.C. § 1345 also provides subject matter jurisdiction. Section 1345 states "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States." 28 U.S.C. § 1345. As a leading treatise states, "[n]o subject matter jurisdiction difficulties are presented when the United States is the plaintiff in an action in the federal courts," 14 Charles A. Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice and Procedure* § 3651 at 208 (3d ed.1998), unless "the government [ ] lend[s] its name to a lawsuit merely for the benefit of a private individual." *Id.* at 213. If there is any question regarding the interest involved, the operative inquiry is whether the United States is "litigat[ing] [ ] in order to assure the proper implementation of one of the government's policies and programs." *Id.* at 215.

Here, the United States is the Plaintiff, and Defendant does not contend that Plaintiff has brought this action "merely for the benefit of a private individual." *Id.* at 213. Even if Defendant did so argue, it is indisputable that Plaintiff is "litigat[ing][ ] in order to assure the proper implementation of one of the government's policies and programs." *Id.* at 215. Consequently, I will not dismiss this case for lack of subject matter jurisdiction.

### 2.

The next question is whether the *Harmon* decision applies to this case, and if so, whether the Eighth Circuit correctly interpreted the RCRA.

### a.

Under the RCRA, States can apply to the Environmental Protection Agency (EPA) for authorization to administer and enforce their own hazardous waste programs after they promulgate regulations consistent with the RCRA's requirements. *See* 42 U.S.C. § 6926(b). If authorization is granted, the "state is authorized to carry out such program in lieu of the Federal program under this subchapter ... and to issue and enforce permits for the storage, treatment, or disposal of hazardous waste." *Id.* In a subsection of Section 6926 entitled "Effect of State permit," the RCRA states: "Any action taken by a State under a hazardous waste program authorized under [the RCRA] [has] the same force and effect as action taken by the [EPA] under this subchapter." 42 U.S.C. § 6926(d). Once the EPA authorizes a state, however, authorization can be withdrawn only when

the Administrator [of the EPA] determines after public hearing that [the] State is not administering and enforcing a program authorized under [the RCRA] in accordance with requirements of [the RCRA], he [ ] so notif[ies] the State and, [ ] appropriate corrective action is not taken within a reasonable time, not to exceed ninety days.

42 U.S.C. § 6926. Under Section 6928(a)(2), the EPA retains the power to independently address "violations [of the RCRA that] occur[ ] in [ ] State[s] which [are] authorized to carry out a hazardous waste program under section 6926 of this title" by "commencing a civil action under this section" provided "the Administrator [first] give[s] notice to the State in which such violation has occurred." 42 U.S.C. § 6928(a)(2).

In *Harmon,* the EPA filed an administrative enforcement action against Harmon Industries, Inc. (Harmon Industries) seeking a monetary penalty for violation of the RCRA. *Harmon,* 191 F.3d at 897. At the same time, Harmon Industries negotiated with the State of Missouri regarding the same violations. *Id.* During the pendency

of the EPA's court action, Harmon Industries and the State of Missouri reached a settlement which released Harmon Industries from any monetary penalty. *Id.* A Missouri State court subsequently approved the consent decree. *Id.* The EPA then successfully pursued their enforcement action through the administrative process, and Harmon Industries appealed to federal court.

In reversing the administrative enforcement action, the Eighth Circuit first defined "overfiling" as "the EPA's process of duplicating enforcement actions." *Harmon*, 191 F.3d at 898. The *Harmon* court then held that the EPA can undertake its own enforcement action after providing notice to an authorized state only if either the authorized state fails to initiate an enforcement action, or the Federal Government withdraws authorization. *Id.* at 899 (upon giving notice, the EPA may pursue an enforcement action "only after State authorization is rescinded or if the state fails to initiate an enforcement action"). Because the State of Missouri had undertaken its own enforcement action and the EPA did not withdraw the State's authorization, the Eighth Circuit dismissed the EPA's action.

Here, Plaintiff's action does not duplicate the action undertaken by the CDPHE. The CDPHE's enforcement action did not obtain financial assurances, and Defendants have not cited any provision of either the Final Administrative Compliance Order, or the Administrative Penalty Order that releases Defendants from the RCRA's requirement of financial assurances. Under the Eighth Circuit's definition, therefore, Plaintiff's action here does not constitute an "overfiling."

This does not end the analysis because the Eighth Circuit's ruling prohibits the EPA from acting when a state takes "any" enforcement action, irrespective of whether an EPA suit duplicates any part of the state's action. *See id.* at 899 ("If the state fails to initiate *any* action, then the EPA may institute its own action."); 901 ("the

federal government's right to pursue an enforcement action under the RCRA attaches only when a state's authorization is revoked or when a state fails to initiate *any* enforcement action.") (emphases added). Because Defendants rely on *Harmon*'s expansive holding in their cross-motion, *Harmon*'s factual distinctions arguably have no bearing on the applicability of the Eighth Circuit's legal interpretation of the RCRA to this case. Consequently, I turn next to the *Harmon* court's interpretation of the RCRA.

b.

i.

" 'Where, as here, resolution of a question of federal law turns on a statute and the intention of Congress, [I] look first to the statutory language' " to determine whether it either has a plain meaning or is ambiguous. *Gudenkauf v. Stauffer Communications, Inc.*, 158 F.3d 1074, 1079 (10th Cir.1998) (quoting *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). " 'The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.' " *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)). "[My] inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.' " *Robinson*, 519 U.S. at 340, 117 S.Ct. 843 (quoting *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)).

If the statutory language is ambiguous and Congress has charged an agency to administer the statute, however, I must "defer to the agency's interpretation, if it is a permissible one." *Southern Utah Wilderness Alliance v. Dabney*, 222 F.3d 819, 824 (10th Cir.2000) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). "The Su-

preme Court has 'long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer.'" *Rivera–Jimenez v. INS*, 214 F.3d 1213, 1218 (10th Cir.2000) (quoting *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778). *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) (noting that courts must give "great deference" to the interpretations of agencies). Nevertheless, "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. 2778. "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza–Fonesca*, 480 U.S. 421, 447 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (quoting *Watt v. Alaska*, 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981)). *But see Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 1662, 146 L.Ed.2d 621 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant Chevron-style deference.").

The *Harmon* court's interpretation of the RCRA derives from the conclusion that the " 'in lieu of' language contained in [Section 6926(b) ] reveals a congressional intent for an authorized state program to supplant the federal hazardous waste program in all respects *including enforcement.*" *Harmon*, 191 F.3d at 899 (emphasis added). In reaching this conclusion, the Eighth Circuit conceded that the "in lieu of" language in Section 6926(b) refers to the regulations promulgated by authorized states. *See id.* at 898–99 ("According to the EPA, the phrase 'in lieu of' refers to which regulations are to be enforced in an authorized state.... [T]he EPA is correct that the 'in lieu of' language refers to the program itself"). Nevertheless, the *Har-*

*mon* court determined that the "in lieu of" language must also apply to the enforcement of state regulations because "the administration and enforcement of the [regulations] are inexorably intertwined." *Id.*

Based on this foundational conclusion, the Eighth Circuit held that the plain language of Section 6928(a)(2)—that the Administrator of the EPA can file an enforcement action in an authorized state after giving notice to that state—cannot be given its plain meaning when it is "interpreted within the context of the entire Act." *Id. See id.* (indicating that the *Harmon* court was conducting a "plain language" analysis of the RCRA). The *Harmon* court considered Section 6928(b) together with the "in lieu of" language of Section 6926(b), and the " 'same force and effect language' of section 6926(d)," and concluded that the Federal Government can initiate an action under Section 6928(a)(2) after providing notice to an authorized state only if either the authorized state fails to initiate an enforcement action, or the Federal Government withdraws authorization. *Id.* at 899. *See* 42 U.S.C. § 6928(a)(2) ("[i]n the case of a violation of any requirement of this subchapter where such violation occurs in a State which is authorized to carry out a hazardous waste program under section 6926 of this title, the Administrator shall give notice to the State in which such violation has occurred prior to issuing an order or commencing a civil action under this section"); 42 U.S.C. § 6926(d) ("[a]ny action taken by a State under a hazardous waste program authorized under this section shall have the same force and effect as action taken by the Administrator"). Accordingly, under *Harmon*, the notice requirement of section 6928(a)(2) "reinforces the primacy of a state's enforcement rights under RCRA," and thereby justifies appending restrictions on the EPA's enforcement power not found explicitly in any part of the statute. *Harmon*, 191 F.3d at 899.

With all due respect, I conclude that the *Harmon* decision incorrectly interprets the RCRA. As an initial matter, the plain meaning of Section 6926's "in lieu of" language is that an authorized state's regulations supplant those of the Federal Government, as the *Harmon* court conceded. *See Harmon,* 191 F.3d at 899. It is questionable, however, that "the administration and enforcement of the program are inexorably intertwined" under the RCRA. *Id.* Indeed, while Section 6926 primarily addresses the administration and enforcement of state regulations by authorized states, Section 6928 concerns the federal enforcement of such regulations. The very structure of the RCRA suggests, therefore, that the administration and enforcement of state regulations are not "inexorably intertwined."

The structure of the sentence containing the "in lieu of" language also suggests that Congress did not intend "in lieu of" to apply to enforcement. Section 6926(b) states that an authorized state "is authorized to carry out [its] program in lieu of the Federal program under this subchapter in such State *and* to issue and enforce permits for the storage, treatment, or disposal of hazardous waste." 42 U.S.C. § 6926(b) (emphasis added). Because the administration of state authorized programs, and the enforcement of state regulations are addressed in separate clauses, the structure of Section 6926(b) indicates Congress' intent that administration and enforcement are not "inexorably intertwined."

In addition, the plain language of Section 6926(b) indicates that the "in lieu of" appearing in the first clause does not modify the second clause in which the question of enforcement is explicitly addressed. *Harmon*'s interpretation of the contested sentence in Section 6926(b) renders the second clause superfluous. If the " 'in lieu of' language contained in [Section 6926(b)] reveals a congressional intent for an authorized state program to supplant the federal hazardous waste program in all respects

*including enforcement,*" *Harmon,* 191 F.3d at 899 (emphasis added), Congress would have had no reason to include the second clause granting enforcement powers to authorized states. Because I cannot "construe a statute in a way that renders 'words or phrases meaningless, redundant, or superfluous,' " *Proctor and Gamble Co. v. Haugen,* 222 F.3d 1262, 1272 (10th Cir. 2000) (quoting *Bridger Coal Co./Pac. Minerals, Inc. v. Director, Office of Workers' Compensation Programs,* 927 F.2d 1150, 1153 (10th Cir.1991)), I cannot adopt the *Harmon* decision's interpretation. *See also Hohn v. U.S.,* 524 U.S. 236, 249, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998) ("We are reluctant to adopt a construction making another statutory provision superfluous") (citations omitted). Consequently, the plain language of the RCRA does not support one of the main foundations upon which the *Harmon* decision is built—that the " 'in lieu of' language contained in [Section 6926(b)] reveals a congressional intent for an authorized state program to supplant the federal hazardous waste program in all respects *including enforcement.*" *Id.* (emphasis added).

ii.

Undermining this foundation has profound effects on the rest of the conclusions in *Harmon. Harmon* held that the EPA can undertake its own enforcement action after providing notice to an authorized state only if either the authorized state fails to initiate an enforcement action, or the Federal Government withdraws authorization. *Id.* at 899. As the *Harmon* court acknowledged, however, this conclusion is not derived from the plain language of the RCRA, but is reached only by "harmonizing" Sections 6926(b) and 6928(a). *Id.* Such harmonization is achieved only if the " 'in lieu of' language contained in [Section 6926(b)] reveals a congressional intent for an authorized state program to supplant the federal hazardous waste program in all respects *including enforcement.*" *Id.* (emphasis added). If the plain language of the RCRA does not indicate

that federal enforcement authority has been "supplant[ed]" by state authority in authorized states, then there is no reason to impose restrictions on federal authority not found explicitly in the statute.

Moreover, it is not necessarily inconsistent to conclude that Section 6928(a)(2)'s notice requirement both "reinforces the primacy of a state's enforcement rights under RCRA," and allows the EPA to institute enforcement actions after providing notice. It is reasonable to conclude that Congress included the notice requirement to minimize the likelihood of duplicative actions. The notice requirement achieves this end by providing authorized states with the opportunity to incorporate the remedies or claims identified by the EPA into either new or existing enforcement actions before the EPA institutes its own action.

The *Harmon* court's interpretation of Section 6926(d) similarly rests on a flawed interpretation of Section 6926(b). Under the heading "Effect of State permit," Section 6926(d) states that "[a]ny action taken by a State under a hazardous waste program authorized under this section shall have the same force and effect as action taken by the Administrator under this subchapter." In interpreting this subsection, the *Harmon* court stressed the "[a]ny action" language and stated

> The state authorization provision substitutes state action (not excluding enforcement action) for federal action. It would be incongruous to conclude that the RCRA authorizes states to implement and administer a hazardous waste program "in lieu of" the federal program where only the issuance of permits is accorded the same force and effect as an action taken by the federal government.... Nothing in the statute suggests that the "same force and effect" language is limited to the issuance of permits but not their enforcement. We believe that if Congress had intended such a peculiar result, it would have

stated its preference in a clear and unambiguous manner.

*Harmon,* 191 F.3d at 900. Construing "the Act as a whole," *id.,* the *Harmon* court disregarded the title of Section 6926(d), and concluded that the subsection applies to enforcement actions.

Nevertheless, if "an authorized state program [does not] supplant the federal hazardous waste program in all respects *including enforcement,*" *Harmon,* 191 F.3d at 899 (emphasis added), it is not necessarily "incongruous" or "peculiar" to conclude that Section 6926(d) applies only to the issuance of permits. *Id.* at 900. Instead, it is reasonable to conclude that Congress intended to restrict the effect of Section 6926(d) to state-issued permits because otherwise there could be doubt as to whether the recipient of a state permit also needs to obtain a permit from the EPA in accordance with Section 6925(a). *See* 42 U.S.C. § 6925(a) ("the Administrator shall promulgate regulations requiring each person owning or operating an existing facility or planning to construct a new facility for the treatment, storage, or disposal of hazardous waste identified or listed under this subchapter to have a permit issued pursuant to this section."). Accordingly, Congress' reference to "[a]ny action" within Section 6926(d) creates ambiguity in light of the rest of the statute.

The Supreme Court has held that "the title of a statute or section can aid in resolving an ambiguity in the legislation's text." *INS v. National Ctr. for Immigrants' Rights, Inc.,* 502 U.S. 183, 189, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991). *See Almendarez–Torres v. United States,* 523 U.S. 224, 234, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (" 'the title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute") (quoting *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R. Co.,* 331 U.S. 519, 528–529, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947)). The title of Section 6926(d)—"Effect of State permit"—indicates Congressional intent to limit the

scope of Section 6926(d) to the permitting process. I conclude that such an interpretation is the most reasonable because it both gives effect to every word of the statute, and does not necessitate "harmonizing" Section 6928 by adding restrictions on the EPA's enforcement power not found in the plain language of that section.

### iii.

The alternative holding in *Harmon* underscores a further fundamental problem with the outcome in that case. In that alternative holding, the *Harmon* court assumed ambiguity exists within the RCRA and interpreted the statute's legislative history to reach the same outcome. *See Garcia v. U.S.*, 469 U.S. 70, 76, n. 3, 105 S.Ct. 479, 83 L.Ed.2d 472 (" '[r]esort to legislative history is only justified where the face of the [statute] is inescapably ambiguous' ") (quoting *Schwegmann Brothers v. Calvert Distillers Corp.*, 341 U.S. 384, 395, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) (concurring opinion)); *Oklahoma v. New Mexico*, 501 U.S. 221, 234 n. 5, 111 S.Ct. 2281, 115 L.Ed.2d 207 (1991) ("we repeatedly have looked to legislative history and other extrinsic material when required to interpret a statute which is ambiguous") (citations omitted). Yet the *Harmon* court gave short shrift to the EPA's interpretation of the RCRA under such circumstances. As the Supreme Court has stated,

> if a statute is silent or ambiguous with respect to the question at issue, our longstanding practice is to defer to the 'executive department's construction of a statutory scheme it is entrusted to administer,' *Chevron, supra,* 467 U.S., at 844, 104 S.Ct., at 2782, unless the legislative history of the enactment shows with sufficient clarity that the agency construction is contrary to the will of Congress.

*Japan Whaling Ass'n v. American Cetacean Soc.,* 478 U.S. 221, 233, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986). Accordingly, the *Harmon* decision failed to consider properly the EPA's interpretation of the RCRA.

Under the EPA's interpretation, the only restriction on its authority to pursue enforcement actions independent of comparable state actions is that explicitly included in Section 6928(a)(2), the notice requirement. *See* 42 U.S.C. § 6928(a)(2) (before filing an enforcement action the EPA must "give notice to the State in which [the] violation has occurred."). 40 C.F.R. § 271.16(c) specifies that "a civil penalty assessed, sought, or agreed upon by the State Director under paragraph (a)(3) of this section shall be appropriate to the violation." In a "Note" to Section 271.16(c), the EPA states

> To the extent the State judgments or settlements provide penalties in amounts which EPA believes to be substantially inadequate in comparison to the amounts which EPA would require under similar facts, EPA, when authorized by applicable statute, may commence separate actions for penalties.

40 C.F.R. § 271.16(c). The language "when authorized by applicable statute" is included because the EPA settled a lawsuit challenging certain parts of its proposed consolidation of the requirements and procedures for separate state permit programs authorized under various statutes. The "Note" was part of the settlement and was intended to apply to three separate permit programs authorized under the RCRA, the Clean Water Act, and the Safe Drinking Water Act. *See* 47 FR 25546 (June 14, 1982). The settlement was contingent on the EPA "promulgat[ing] final rules [with respect to all three programs] which are *substantially the same* as these proposed rules" in the settlement. *Id.* at 25547 (emphasis added). The EPA did just that on September 1, 1983 by incorporating the "Note" without change into the regulations of all three programs. *See* 48 FR 39611 (September 1, 1983). Consequently, the fact that the language "when authorized by applicable statute" is included in Section 271.16(c) indicates that the EPA had no doubt that "overfiling" is permissible under the RCRA.

Other regulations reflect EPA's statutory interpretation of the power to overfile. 40 C.F.R. § 271.19 states in relevant part:

(e) Under Section 3008(a)(3) of RCRA, *EPA may* terminate a State-issued permit or *bring an enforcement action* in accordance with the procedures of 40 CFR Part 22 in the case of a violation of a State program requirement. In exercising these authorities, EPA will observe the following conditions:

(1) *The Regional Administrator may take action* under section 3008(a)(3) of RCRA against a holder of a State-issued permit *at any time* on the ground that the permittee is not complying with a condition of that permit.

(2) *The Regional Administrator may take action* under Section 3008(a)(3) of RCRA against a holder of a State-issued permit *at any time* on the ground that the permittee is not complying with a condition that the Regional Administrator in commenting on the permit application or draft permit stated was necessary to implement approved State program requirements, whether or not that condition was included in the final permit.

(3) The Regional Administrator may not take action under section 3008(a)(3) of RCRA against a holder of a State-issued permit on the ground that the permittee is not complying with a condition necessary to implement approved State program requirements unless the Regional Administrator stated in commenting on the permit application or draft permit that the condition was necessary.

(4) *The Regional Administrator may take action* under Section 7003 of RCRA against a permit holder *at any time* whether or not the permit holder is complying with permit conditions.

40 C.F.R. § 271.19 (emphases added). Although this regulation applies to Section 6928(a)(3) ("Any order issued [by the Administrator of the EPA] pursuant to this subsection may include a suspension or revocation of any permit issued by the Administrator or a State under this subchapter and shall state with reasonable specificity the nature of the violation"), it rejects the fundamental tenet of the *Harmon* decision that "an authorized state program supplant[s] the federal hazardous waste program in all respects *including enforcement*." *Harmon*, 191 F.3d at 899 (emphasis added). Under *Harmon*'s reasoning, the EPA could not act under Section 6928(a)(3) unless it first revoked the authorization of the state within which the violation occurred. Sections 271.16(c), and 271.19 indicate EPA's belief that the only restrictions on its authority to bring enforcement actions are those *explicitly* stated in the RCRA. *See* 40 C.F.R. §§ 271.16(c), 271.19

Defendants argue that I must disregard these regulations because a contemporaneous interpretation by the EPA of the RCRA conflicts with the interpretation found in 40 C.F.R. §§ 271.16(c), 271.19. *See Defendants' Reply* at 15–16 (citing *Watt v. Alaska*, 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981) ("The Department's current interpretation, being in conflict with its initial position, is entitled to considerably less deference.")). The alleged interpretation is found in testimony by an EPA Assistant Administrator, Thomas C. Jorling, before the Senate Subcommittee of Resource Protection of the Committee on Environment and Public Works. The relevant exchange is as follows:

Senator Randolph: Thank you very much. Two of out panelists, Mr. Wingerter and Mr. Plehn, I understand, will suggest that EPA grant only partial interim program authorization for those portions of the hazardous waste control program which a state can actually administer in an effective way. This would be in place of what we call the total interim authorization that I think you intend to give to states for any part of

their program. What do you think of such an approach?

Mr. Jorling: Mr. Chairman, when we get into the period of full implementation of the hazardous program, it is our view that that program is best conducted by one or the other level of government, either the State or the Federal. It is very hard to operate a program with segregated responsibility. It is a cohesive program of regulation; it is one that requires very close implementation of several pieces, so that our implementation, when we are in the full versus the interim period should be completely performed by one level of government. We would not have the benefit to the public by such segmented implementation by piecemeal implementation. It just becomes too great of a management task. Therefore, we support the concept of full authorization and full implementation of those responsibilities by the States.

"Resource Conservation and Recovery Act Oversight," Hearing before the Subcommittee of Resource Protection of the Senate Committee on Environment and Public Works, 95th Cong., 2d Sess. at 22 (Mar. 20, 1978) (testimony of Thomas C. Jorling). In their reply, Defendants only reproduce Mr. Jorling's response to the question, and characterize its meaning as "once an authorized state program was fully implemented, hazardous waste regulation and enforcement would be conducted by *either* the Federal government or by the State governments, *but not both.*" *Defendants' Reply* at 15 (emphasis in original).

I note first that Mr. Jorling did not explicitly address the question of enforcement in his answer. In addition, once both Mr. Jorling's response *and* the relevant question are considered together, it is clear that Mr. Jorling's answer, far from addressing the question of enforcement as Defendants maintain, concerns the manner in which "interim authorization" of a state's hazardous waste program under Section 6926(c) should be implemented. *See* 42 U.S.C. § 6926(c). Consequently, I

will not disregard the EPA's interpretation of its enforcement authority in 40 C.F.R. §§ 271.16(c), 271.19 on the basis of Mr. Jorling's testimony. In any event, Defendants should have included Senator Randolph's query in their citation to Mr. Jorling's testimony, as their duty of candor requires.

Even if I were to accept that Mr. Jorling's testimony applied to the EPA's enforcement authority, the Supreme Court has held that "interpretations ... [that] lack the force of law[ ]do not warrant Chevron-style deference. Instead, [such] interpretations ... are 'entitled to respect' under our decision in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), but only to the extent that those interpretations have the 'power to persuade.'" *Christensen*, 120 S.Ct. at 1657 (citations omitted). It is indisputable that Mr. Jorling's Senate testimony "lack[s] the force of law." I conclude, therefore, that the above testimony has no "power to persuade" with respect to Defendants' proposed interpretation thereof in light of the full context of the testimony, and the EPA's regulations concerning the scope of their enforcement powers. *See id.* ("Of course, the framework of deference set forth in Chevron does apply to an agency interpretation contained in a regulation."). Accordingly, Mr. Jorling's testimony does not trump the EPA's interpretation of 40 C.F.R. §§ 271.16(c), 271.19.

I also will not disregard the EPA's interpretation because it is "contrary to the will of Congress." *Japan Whaling Ass'n*, 478 U.S. at 233, 106 S.Ct. 2860. Defendants primarily rely on two separate provisions of a report published by the House of Representatives regarding a preliminary version of the RCRA:

This legislation permits the states to take the lead in the enforcement of the hazardous wastes [sic] laws.... Although the Administrator is required to give notice of violations of this title to the states with authorized hazardous waste programs the Administrator is not

prohibited from acting in those cases where the state fails to act, or from withdrawing approval of the state hazardous waste plan and implementing the federal hazardous waste program pursuant to Title III of this act.

. . . . .

[T]he Administrator, after giving the appropriate notice to a state that is authorized to implement the state hazardous waste program, that violations of the Act are occurring and the state failing to take action against such violations, is authorized to take appropriate action against those persons in such state not in compliance with the hazardous waste title.

H.Rep. 1491, 94th Cong., 2d Sess. 31, 32 reprinted in 1976 U.S.C.C.A.N. 6238, 6269, 6270. Nevertheless, these provisions of the House Report do not explicitly prohibit Plaintiff's action here. After Plaintiff provided notice to CDPHE regarding the RCRA remedies the CDPHE's preexisting enforcement action failed to address, Colorado "fail[ed] to act" with respect to those remedies.

I also note that Congress knew how to specifically prohibit enforcement action once *any* action is undertaken by a state. Section 6972 prohibits citizen suits to enforce the RCRA "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with such permit, standard, regulation, condition, requirement, prohibition, or order." 42 U.S.C. § 6972(b)(1)(B). Similar language was not included in Section 6928. " '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Brown v. Gardner,* 513 U.S. 115, 120, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) (quoting *Russello v. U.S.,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)).

Defendants also cite statements by individual Senators purportedly supporting the proposition that "Congress recognized that hazardous waste regulation [is] essentially a local issue." *Defendants' Response* at 18 (citing, *e.g.,* Senator Randolph's statement that "This legislation recognizes that solid waste is a uniquely local problem."). The text of the statute, however, indicates that Congress thought otherwise. *See* 42 U.S.C. § 6901(a)(4) ("The Congress finds with respect to solid waste ... that while the collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies, the problems of waste disposal as set forth above have become a matter *national in scope and in concern* "); 42 U.S.C. § 6902(b) ("The Congress hereby declares it to be the *national policy of the United States* that, wherever feasible, the generation of hazardous waste is to be reduced or eliminated as expeditiously as possible. Waste that is nevertheless generated should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment.") (emphasis added). *See also* 42 U.S.C. § 6903(5) (emphasis added) ("The term 'hazardous waste' means a solid waste"). I cannot let the statements of individual Senators trump explicit statutory text. Under these circumstances, I will not conclude that "the legislative history of the enactment shows with sufficient clarity that the agency construction is contrary to the will of Congress." *Japan Whaling Ass'n,* 478 U.S. at 233, 106 S.Ct. 2860.

iv.

Finally, the consequences of the *Harmon* decision support my view of Congressional intent in writing the RCRA. Consider an authorized state with an unblemished record of both complying with the RCRA and working cooperatively with the EPA that discovers significant pollution caused by a large industrial employer located within the authorized state but in close proximity to the border of at least one

other state. Because the polluting entity employs a large number of the authorized state's citizens, and provides significant tax revenues to the authorized state, the authorized state is less than inclined to take the action mandated by the RCRA that might put the polluting employer at risk. Consequently, the authorized state, even after appeals from the EPA, takes minimal enforcement action against the polluting employer that protects the citizens of neither the authorized state nor the neighboring state(s). Under *Harmon*'s analysis of the RCRA, EPA's only course of action would be to de-authorize the authorized state's *entire* hazardous waste program, notwithstanding the state's otherwise perfect record of enforcing the RCRA, in order to protect the citizens of the affected states. Based on the statute and legislative history, I find no evidence that Congress intended such an outcome.

■ For the foregoing reasons, and because Defendants do not dispute that Plaintiff provided the notice required by Section 6928(a)(2) to the CDPHE prior to commencing this action, *See Plaintiff's Response*, Ex. 8 (letter dated August 26, 1996 informing the CDPHE that its actions with respect to Defendant PEC had not been "timely and/or appropriate," and that unless the CDPHE so acted, Plaintiff would seek to enforce the RCRA itself); *Plaintiff's Motion for Summary Judgment*, Ex. 25 (affidavit of Carol Rushin, Assistant Regional Administrator, Office of Enforcement, Compliance and Environmental Justice, EPA, that subsequent to the August 26, 1996 letter Plaintiff informed the CDPHE that its failure to seek financial assurances was inappropriate), I conclude that the RCRA does not prohibit this action.

3.

I find unpersuasive Defendants' final argument that *res judicata* bars Plaintiff's claims here. In *Drummond v. U.S.*, 324 U.S. 316, 65 S.Ct. 659, 89 L.Ed. 969 (1945), the Supreme Court held that as a general

matter "to bind the United States when it is not formally a party, it must have a laboring oar in a controversy." *Drummond v. U.S.*, 324 U.S. 316, 318, 65 S.Ct. 659, 89 L.Ed. 969 (1945). The United States has a "laboring oar" when it "assume[s] control over litigation," *Montana v. U.S.*, 440 U.S. 147, 154, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), by "employ[ing] counsel to represent its interest ... or otherwise actively aid[ing] in [the] conduct" of the litigation. *Drummond*, 324 U.S. at 318, 65 S.Ct. 659. In *Montana*, such control was evident because the United States:

> (1) required the [ ] lawsuit to be filed;
>
> (2) reviewed and approved the complaint;
>
> (3) paid the attorneys' fees and costs;
>
> (4) directed the appeal from State District Court to the Montana Supreme Court;
>
> (5) appeared and submitted a brief as amicus in the Montana Supreme Court;
>
> (6) directed the filing of a notice of appeal to this Court; and
>
> (7) effectuated [the] abandonment of that appeal on advice of the Solicitor General.

*Montana*, 440 U.S. at 154, 99 S.Ct. 970. In the context of federal-state relations, one leading treatise concludes that "[i]t is clear that state and federal governments are separate parties for res judicata purposes, so that litigation by one does not bind another." 18 C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure*, § 4458 at 503. Nevertheless, both *Harmon* and one other federal court has applied *res judicata* to a suit brought by the federal government after a state concluded a similar suit. *See U.S. v. ITT Rayonier, Inc.*, 627 F.2d 996 (9th Cir.1980).

In my view, the *Harmon* decision results in an unsupported expansion of the doctrine of *res judicata* as it is applied to the federal government under existing Supreme Court authority. The *Harmon* court decided that because the RCRA "au-

thorized the state to proceed 'in lieu of' the federal government and 'with the same force and effect' as the federal government.... [t]he 'laboring oar' is pulled on much earlier in the process.... [w]hen the EPA grants the state permission to enforce the EPA's interests through the state's own hazardous waste program." *Harmon,* 191 F.3d at 904. The *Harmon* court failed to cite any authority in which the federal government was deemed to have a "laboring oar" on the basis of a similarly attenuated connection, nor am I aware of any. Instead, the *Harmon* court cited generally to the Ninth Circuit's decision in *Rayonier.*

The *Rayonier* court, however, did not undertake the "laboring oar" analysis. The Ninth Circuit assessed whether the application of *res judicata* would "promot[e] harmony and cooperation between courts." *Rayonier,* 627 F.2d at 1001. Because it does not address whether the Federal Government pulled a "laboring oar" in the state court proceedings, I find the *Rayonier* decision unpersuasive.

*Rayonier* is distinguishable for another reason. In *Rayonier,* the EPA authorized Washington State to issue permits under the Federal Water Pollution Control Act (FWPCA). Washington State then issued a permit to ITT Rayonier, Inc. that stated in "footnote f" that certain standards stated in the permit "will be modified to be consistent with the applicable final effluent when promulgated by the EPA in the Federal Register, or as thereafter modified by final action consequent upon any appeal from such guidelines." *Id.* at 999.. In November 1975, the EPA notified Washington State that ITT Rayonier was not complying with new standards promulgated by the EPA that applied to ITT Rayonier under footnote f. Washington State issued a compliance order in December 1975 which was overturned by an intermediate state appellate court ruling that the new regulations did not apply to ITT Rayonier under footnote f. Soon thereafter, the EPA filed its own suit in federal court

raising the same argument. The *Rayonier* court stated that "[i]f the EPA is dissatisfied with state enforcement efforts or the lack thereof it can revoke permit-issuing authority *or bring an independent action in federal court." Id.* at 1002 (emphasis added). Because the "state court [ ] entered a final judgment on [the] identical issue" raised by the EPA in Federal court, the Ninth Circuit held that harmony and cooperation between state and federal courts would be best served if *res judicata* applied to the state court's decision. *See Rayonier,* 627 F.2d at 1001 ("Res judicata is a rule promoting harmony and cooperation between courts").

■ Here, in contrast, the issue of financial assurances was not before the Colorado court. In addition, the CDPHE supports Plaintiff's pursuit of financial assurances. *Plaintiff's Motion for Partial Summary Judgment,* Ex. 1 at 235 (testimony of Walter Avramenko, a CDPHE employee, at preliminary injunction hearing on May 11, 1998 that Colorado supports Plaintiff's action to obtain financial assurances); Ex. 8 at para. 24 (affidavit of Mr. Avramenko dated June 13, 2000). Applying *res judicata* in this instance, therefore, would not "promot[e] harmony and cooperation between courts," *Rayonier,* 627 F.2d at 1001, or between Colorado and the federal government. Instead, Plaintiff's suit here is precisely the type of "independent action" contemplated by the Ninth Circuit. *Id.* at 1002 ("[i]f the EPA is dissatisfied with state enforcement efforts or the lack thereof it can revoke permit-issuing authority *or bring an independent action in federal court.")* (emphasis added). *Rayonier* is distinguishable on its facts. Accordingly, I decline to follow either *Rayonier* or *Harmon,* and instead apply the Supreme Court's analysis in *Drummond* and *Montana.* Because Defendants offer no evidence that Plaintiff exercised the type of control over the CDPHE's state court action identified in *Drummond* and *Montana,* I will not conclude that Plaintiff pulled the "laboring

oar," or otherwise controlled, the CDPHE's action in state court. *See Montana,* 440 U.S. at 154, 99 S.Ct. 970; *Drummond,* 324 U.S. at 318, 65 S.Ct. 659. For the foregoing reasons, the doctrine of *res judicata* does not apply to this case.

### B.

■ In its motion for partial summary judgment, Plaintiff argues that Defendants are covered by the RCRA and that they treated, stored, and disposed of hazardous waste at their Facility in violation of the RCRA. In response, Defendants argue that: (1) financial assurances are no longer required because they are no longer actively violating the RCRA, Colorado statutes, or regulations; (2) because they "made tremendous progress in remediating contaminated soils and groundwater at or around PEC's property, [and are] currently in compliance with the terms and conditions of the Compliance Order," *Defendants' Response* at 2, Plaintiff cannot establish an irreparable injury requiring a permanent injunction; (3) Defendant Lilienthal is not an "operator" of the Facility under Colorado regulations; and (4) the doctrine of laches bars this action. Again, I address each argument in turn.

### 1.

In their response to Plaintiff's motion for partial summary judgment, Defendants neither argue nor present any evidence that their past actions identified in detail by Plaintiff in its *Motion for Partial Summary Judgment* did not constitute treatment, storage, and disposal of hazardous waste at their Facility in violation of the RCRA and relevant state regulations. Defendants have also stipulated that under the RCRA and corresponding Colorado regulations the Facility is a "facility," and Defendants PEC and Redoubt are an "operator" and "owner," respectively, of the Facility. *See Plaintiff's Motion for Partial Summary Judgment,* Ex. 2 at paras. 13–16. *See also* 6 COLO. CODE REGS. 1007–3 §§ 260.10 ("The requirements of

Sections 266.12, 266.14, and 266.16 through 266.17 applies [sic] to owners and operators of hazardous waste facilities, except as otherwise provided in this Section or in Section 264.1."); 266.14 ("An owner or operator of each facility, on the effective date of these regulations, must establish financial assurance for closure of the facility, and if applicable, post-closure financial assurance."). No genuine issue of material fact remains, therefore, regarding whether Defendants violated the RCRA and Colorado regulations, and Defendants PEC and Redoubt are subject to the RCRA and corresponding Colorado regulations. Consequently, summary judgment is appropriate on these questions.

### 2.

Defendants' argument that financial assurances are no longer required because they are no longer actively violating the RCRA, Colorado statutes, or regulations is unpersuasive. At the preliminary injunction stage of this case, Defendants made the same argument. *See U.S. v. Power Engineering Co.,* 10 F.Supp.2d 1145, 1160–61 (D.Colo.1998) (noting Defendants' argument that "the United States may not obtain financial assurances for past violations of RCRA."). As I held in my June 10, 1998 Memorandum Opinion and Order:

Nothing within RCRA's "cradle-to-grave" regulatory scheme indicates that owners and operators of hazardous waste facilities are exempt from providing financial assurance requirements before remediation and closure is accomplished. To the contrary, the clear intent of federal and state regulations is for the financial assurance requirements to attach until remediation, closure, and, if necessary, post-closure care is assured. See 40 C.F.R. § 265.1(a) (standards for Interim Status facilities "define the acceptable management of hazardous waste during the period of interim status and until certification of final closure" (emphasis added)); see also 40 C.F.R. § 265.1(b) (Interim Status standards "apply . . . until either a

permit is issued ... or until applicable ... closure and post-closure responsibilities are fulfilled"); 6 COLO. CODE REGS. 1007–3 §§ 265.1(a) and (b).

Defendants' failure to disclose their treatment, storage, and disposal of hazardous waste does not now exempt them from the financial assurance requirements. The evidence shows that defendants were legally obligated to but did not file a permit application, seek interim status, or cease their activities of treatment, storage, and disposal. Like many of the facilities operating before and after RCRA's effective date, the Facility is now somewhere between the cradle and grave. The recent discovery of defendants' previous unauthorized activities does not, at this juncture, relieve them from their legal obligation to provide financial assurances. To hold otherwise would be contrary to the expressed intent of Congress, the clear language of applicable regulations, and public policy. To reward defendants' past evasion of RCRA would encourage similar conduct by others.

*Id.* at 1161–62. Defendants attack, therefore, a holding that is the law of this case.

"[T]he law of the case 'doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *U.S. v. Monsisvais,* 946 F.2d 114, 115 (10th Cir.1991) (quoting *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)). "The doctrine is 'based on sound public policy that litigation should come to an end and is designed to bring about a quick resolution of disputes by preventing continued re-argument of issues already decided.'" *McIlravy v. Kerr–McGee Coal Corp.,* 204 F.3d 1031, 1035 (10th Cir.2000) (quoting *Gage v. General Motors Corp.,* 796 F.2d 345, 349 (10th Cir.1986) (citations omitted)). The doctrine is, however, "only a rule of practice in the courts and not a limit on their power." *Monsisvais,* 946 F.2d at 116 (citing *Messinger v. Anderson,*

225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912)). The Tenth Circuit has recognized three "exceptionally narrow" grounds for departure from that rule of practice: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice." *U.S. v. Alvarez,* 142 F.3d 1243, 1247 (10th Cir.), *cert. denied,* 525 U.S. 905, 119 S.Ct. 242, 142 L.Ed.2d 199 (1998) (citing Monsisvais, 946 F.2d at 117).

Here, Defendants have provided no reason why I should disregard my previous ruling. Accordingly, my June 10, 1998 holding that Plaintiff is permitted to obtain financial assurances for past violations of the RCRA is the law of the case.

### 3.

The thrust of Defendants' response to Plaintiff's motion for partial summary judgment is that they have "made tremendous progress in remediating contaminated soils and groundwater at or around PEC's property, [and are] currently in compliance with the terms and conditions of the Compliance Order." *Defendants' Response* at 2. Based on this "tremendous progress," Defendants argue that Plaintiff cannot establish the type of irreparable injury necessary to warrant the entry of permanent injunction at the summary judgment stage. I disagree.

Under Tenth Circuit authority,

When the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown.

*Atchison, Topeka and Santa Fe Ry. Co. v. Lennen,* 640 F.2d 255, 259 (10th Cir.1981) (per curiam). Further, "[w]here an injunction is authorized by statute it is unnecessary for plaintiff to plead and prove the

existence of the usual equitable grounds, irreparable injury and absence of an adequate remedy at law. It is enough if the requirements of the statute are satisfied." *Id.* at 260.

Here, "the financial assurance requirements [of the relevant statutes and regulations] attach until remediation, closure, and, if necessary, post-closure care is assured." *Power Engineering,* 10 F.Supp.2d at 1161–62. Moreover, the RCRA specifically authorizes Plaintiff to seek injunctive relief. *See* 42 U.S.C. § 6928(a)(1). Because Defendants do not genuinely dispute that their previous treatment, storage, and disposal of hazardous waste at their Facility requires them to provide financial assurances, or that remediation is incomplete, they are currently in violation of the financial assurance requirements of the Colorado regulations. Consequently, "[D]efendants are engaged in … the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, [and consequently] irreparable harm to the plaintiffs need not be shown." *Atchison,* 640 F.2d at 259. I will not, therefore, deny Plaintiff's motion based on Defendants' allegations that they have made "tremendous progress" in the remediation of the Facility.

### 4.

■ I also find unpersuasive Defendant Lilienthal's argument that there are genuine issues of material fact as to whether he is an operator of the Facility. At all times relevant to this action, Defendant Redoubt owned the lands and buildings at the Facility, and leased both to Defendant PEC. *Plaintiff's Motion for Partial Summary Judgment,* Ex. 2 at para.6–7. At the time Plaintiff filed the initial complaint in this action, Defendant Lilienthal was the president of Defendants PEC and Redoubt, and owned 51% of the outstanding stock in both. *Id.,* Ex. 2 at para. 8. The Lilienthal Family Trust owned the remainder of the stock in both Defendant PEC and Redoubt. *See id.* Ex. 1 at 23. Plaintiff contends, and Defendants do not dispute,

that Defendant Lilienthal now owns 100% of the outstanding stock in Defendant PEC. *Id.* at 13. Moreover, Defendants admit that Defendant "Lilienthal generally was involved in making management decisions for [Defendants PEC and Redoubt], including decisions regarding environmental compliance matters." *Amended Answer* at para. 8.

Defendants' admission is supported by testimony from Defendant Lilienthal and others at Defendants PEC and Redoubt. In Defendant Lilienthal's deposition, the following exchange occurred:

Q: Mr. Lilienthal, are you committed to clean up the Power Engineering property?

A: I am still here. I haven't fled to Belize. I worked for my father since I was 17 years old. I know no other place, no other business. The property is a good property. My company is a good company. I have people that have worked for me for over 40 years there. I have been trying to clean up my property for at least five years or more. I can get no direction. I can get no help. I can get no answers. I have paid multi-thousands of dollars out in lawyer fees.

Yeah, I've done things wrong, probably filled out paperwork that was wrong. I didn't get the things done on time that I was supposed to. I stored some waste for a long time that I shouldn't have stored it. We hoped to reuse it and put it back in the tanks, which we could have done, but we had to ship it out.

All I want to do is I want to clean the property up.

*Plaintiff's Motion for Partial Summary Judgment,* Ex. 1, at 445. In addition, Defendant PEC's comptroller, Daniel Frieson, testified as follows:

Q: I'm going to jump around a little bit again. With regard to environmental decisions at Power Engineering, those are decisions concerning what remedia-

tion to do, how fast to do it, when to do it. Do you make those decisions?

A: No.

Q: Who makes those decisions?

A: Dick Lilienthal.

Q: That would include decisions—to your knowledge, has Mr. Lilienthal involved himself in decisions regarding disposal of hazardous waste?

A: On a day to day basis?

Q: Yes. sir.

A: I talk to Dick about getting set up with the facility. This facility actually talked to our health and safety manager, gave him a price. I looked at the price and said, Dick, this is what we came up with. Is this okay? Do you approve it? Well, he said, yes. So we don't ask him every shipment, does he approve that shipment? It's something—it's just part of our operation that's ongoing.

Q: For instance, if you we're looking at facility cleanup, does Mr. Lilienthal have the ultimate authority to make a determination on how to clean up and how much money to spend?

A: Yes.

Q: And, in fact, does he exercise that authority?

A: Yes.

Q: PEC is a public corporation, is it not?

A: No, it's privately held.

Q: It's privately held. Essentially, is Mr. Lilienthal the person who holds controlling interest in PEC?

A: That's correct.

Q: As a person who holds controlling interest, he would have ultimate authority over its business decisions?

A: That's correct.

Q: Over its environmental decisions?

A: That's correct.

Q: Over the direction and tenor of its relationships with the Environmental Protection Agency or the State of Colorado Department of Health?

A: He is directly involved in it.

*Id.*, Ex. 11 at 87–89.

Under Colorado regulations, " 'operator' means the person operating a hazardous waste management facility or site either by contract or permit." 6 COLO. CODE REGS. § 260.10. Courts have devised two tests to determine operator liability under the RCRA and state regulations. The "authority-to-control" test imposes operator liability "as long as one [entity] had the capability to control [another entity], even if it was never utilized." *Lansford–Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1221 (3d Cir.1993); *see also FMC Corp. v. Aero Indus.*, 998 F.2d 842, 846 (10th Cir.1993) (citing cases) (noting that some courts treat those with authority to control a facility as operators regardless of whether they actually exercise that control). The "actual control" test, in contrast, considers whether a corporation exercised "substantial control" over the activities of another corporation which commits an environmental violation. *Lansford–Coaldale*, 4 F.3d at 1221; *see also FMC*, 998 F.2d at 846 ("Actual control and personal participation in the wrongful conduct clearly makes one an operator under CERCLA."); *U.S. v. Kayser–Roth Corp.*, 910 F.2d 24, 27 (1st Cir. 1990) (holding that to be an operator, a parent corporation must, at a minimum, be actively involved in its subsidiary's activities); *Mathews v. Dow Chem. Co.*, 947 F.Supp. 1517, 1526 (D.Colo.1996) (citing cases) (recognizing that most courts impose operator liability upon one corporation for the acts of another corporation where the first corporation exercises "substantial control" over the second). Although these tests have been devised to determine whether an individual or entity is an "operator" under the Comprehensive Environmental Response Compensation and Liability Act, there is no reason not to apply them to the "operator" inquiry under the RCRA given the similarity of the definitions in both statutes. *See* 42 U.S.C.A. § 9601(20)(A) ("The term 'owner

or operator' means ... any person ... operating such facility").

The Tenth Circuit has not chosen between the two tests, *see FMC,* 998 F.2d at 846 (identifying both approaches but holding that "[w]e need not decide which approach is best because" the Defendant was liable under both), and neither do I. Under either test, Defendant Lilienthal is an "operator" of the facility. Consequently, there is no genuine issue of material fact as to whether Defendant Lilienthal is an operator of the Facility.

### 5.

■ Finally, I reject Defendants' argument that there are "factual disputes as to whether laches bars Plaintiff's claims." *Plaintiff's Response* at 24. The Supreme Court has held that "laches or neglect of duty on the part of officers of the government is no defense to a suit by it to enforce a public right or protect a public interest." *Utah Power & Light Co. v. U.S.,* 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791 (1917). *See Albrechtsen v. Andrus,* 570 F.2d 906, 910 (10th Cir.), *cert. denied,* 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978) (citing *Utah Power & Light* and holding that "[t]he Government is too vast, its operations too varied and intricate, to put it to the risk of losing that which it holds for the nation as a whole because of the oversight of subordinate officials."). Defendants state that no public interest is involved because "the interest sought to be protected by the Plaintiff in this case is the government's economic interest in having PEC pay for remedial activities." *Defendants' Opposition* at 20. If Defendants do not pay for remediation of the Facility, however, it is likely that the Government, and thus the public, will. I conclude, therefore, that Plaintiff's suit is "to ... protect a public interest." *Utah Power & Light Co.,* 243 U.S. at 409, 37 S.Ct. 387. Summary judgment is appropriate against Defendants' claim that the doctrine of laches applies to this case.

Accordingly, IT IS ORDERED THAT

(1) Plaintiff's Motion for Partial Summary Judgment is GRANTED;

(2) Defendants' Motion for Summary Judgment is DENIED;

(3) Defendants are required to provide financial assurances for closure and post-closure care of the Facility and to post third-party assurances in a manner consistent with 6 COLO. CODE REGS. 1007–3 §§ 266 and all applicable subparts; and

(4) Plaintiff is AWARDED ITS COSTS.